IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


VIZANT TECHNOLOGIES, LLC,      :          CIVIL ACTION
et al.                         :
                               :
          v.                   :
                               :
JULIE P. WHITCHURCH, et al.    :          NO. 15-431


MEMORANDUM

Bartle, J.                                    April 29, 2015

        Plaintiffs Vizant Technologies, LLC ("Vizant") and its
chief executive officer ("CEO") Joseph Bizzarro ("Bizzarro")
have filed this action against Julie P. Whitchurch
("Whitchurch") and Jamie Davis ("Davis"), both of whom are
former Vizant employees.  Plaintiffs' ten-count complaint
alleges:  two violations of the Racketeer Influenced and Corrupt
Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968; breach of
contract; misappropriation of trade secrets in violation of the
Delaware Uniform Trade Secrets Act ("DUTSA"), Del. Code Ann.
tit. 6, §§ 2001 et seq.; defamation; tortious interference with
existing and prospective contractual relationships; abuse of
process; conversion; fraud; and civil conspiracy.[1]

---

1.  The claims of breach of contract, misappropriation of trade
secrets, and conversion are brought by Vizant alone against both
defendants.  Both plaintiffs bring the remaining counts against
both defendants.

We have subject matter jurisdiction over plaintiffs'
RICO claims under 28 U.S.C. § 1331 and supplemental jurisdiction
over their remaining claims under 28 U.S.C. § 1367.  Before the
court is the motion of Vizant for preliminary injunctive relief
on its claims for breach of contract, violations of DUTSA,
tortious interference with existing and prospective contractual
relationships, and defamation.  The court held an evidentiary
hearing on the motion and now makes the following findings of
fact and conclusions of law.

I.

Vizant, formerly PE Systems, LLC, is a financial
consulting firm.  The company is organized under the laws of
Delaware and has its principal place of business in Chadds Ford,
Pennsylvania.  At all times relevant hereto, its CEO has been
plaintiff Bizzarro and its chief financial officer has been
David Jablonski ("Jablonski").  Its three-member board of
directors includes its chair Frank Seidman ("Seidman") as well
as Lane Wiggers ("Wiggers").

Vizant is owned in part by Capital Solutions, Inc.
("Capital Solutions"), an entity founded by Seidman which is
engaged by investors to monitor various portfolio companies.
Vizant is among those companies monitored by Capital Solutions.
Wiggers is a former Capital Solutions employee.  In its history,
Vizant has served nearly 3,500 clients, approximately 800 of

-2-

them current.  It works with clients in both the for-profit and nonprofit sectors and operates on a national level.

Among other things, Vizant's expertise lies in identifying strategies for its clients to reduce the costs and fees associated with inbound payments such as the percentages clients are charged by credit card companies.  Vizant develops these strategies by conducting a highly detailed assessment of a client's finances and by utilizing its detailed knowledge of credit card companies' methods of operation.  Upon entering into an agreement with a new client, Vizant first obtains data from that client about its finances spanning the course of approximately one year.  This process can take several months for Vizant to complete.

Vizant then conducts a detailed analysis of the data obtained from the client and generates a document known as a cost reduction report.  Each cost reduction report contains background information about the client, including its reported sales and reported volume of inbound credit card payments.  The cost reduction report then provides comprehensive information about the relevant costs being incurred by the client at the time the report is generated and defines "cost reduction opportunities," which are essentially Vizant's recommendations as to how the client can reduce the charges associated with processing incoming credit card payments.  These recommendations

-3-

are in part the result of Vizant's negotiations with credit card
providers to lower the client's rates.  The recommendations also
stem from Vizant's analytical processes, for which the company
holds several patents.  Vizant is compensated for its services
on a "results basis."  It shares with its clients any savings
obtained as a result of the implementation of the
recommendations outlined in the cost reduction report.

        Vizant and its clients consider the contents of cost
reduction reports to be sensitive and highly confidential.
Vizant's clients have an interest in ensuring that the financial
information about them contained in the reports is not disclosed
to their competitors.  It is not uncommon for prospective
clients to require that Vizant enter into a nondisclosure
agreement before they engage Vizant's services.  Similarly,
Vizant has an interest in maintaining secrecy with respect to
its compensation from its clients and with respect to the
reduction in rates it is able to negotiate with credit card
servicers on behalf of its clients.

        For these reasons, Vizant goes to great lengths to
maintain the confidentiality of its cost reduction reports and
other client data.  For example, the company maintains a robust
network security infrastructure and does not permit clients to
submit data via email.  Vizant also limits the number of
employees who are privy to each cost reduction report for a

client.  In addition, Vizant requires all of its employees,
including its CEO, to sign confidentiality agreements.  Finally,
the standard professional services agreement into which Vizant
enters with new clients contains a confidentiality provision.
This provision defines "Confidential Information" as

>               any and all information created by VIZANT
>               not otherwise in the public domain prior to
>               the execution of this Agreement, as well as
>               information that was derived from the public
>               domain but was subsequently collected into a
>               list or other document of any kind or has
>               been fashioned, manipulated, sorted,
>               organized, categorized, and/or filtered by
>               VIZANT.  This shall specifically include but
>               not be limited to VIZANT [sic] report given
>               to Client."

According to the professional services agreement, the parties
thereto must "hold all Confidential Information exchanged in
strictest confidence" and said information "shall not be used by
either party nor revealed to any third party . . . for any
purpose other than to facilitate the performance of the parties'
respective obligations under this Agreement."

Vizant hired defendant Julie Whitchurch in August 2011
as a Business Development Manager, a sales position.  Defendant
Jamie Davis, who is the sister of Whitchurch, became a Vizant
employee approximately nine months later, also in the role of
Business Development Manager.  Whitchurch was promoted in July
2013 to the supervisory role of National Director of Business

Development.  Both defendants resided then, and reside now, in Georgia.

Each defendant, upon commencing her employment with Vizant, signed a document styled "Confidentiality, Non-Competition and Assignment Agreement"[2] (the "confidentiality agreement").  Each of these confidentiality agreements was also signed by Shawna Kurimura ("Kurimura"), a human resources official at Vizant.[3]  The agreements contained detailed provisions regarding the handling of material that Vizant considered confidential, defining "Confidential Information" as follows:

> "Confidential Information" means any of the proprietary or confidential information, technical data, trade secrets or know-how of the Company, in any form or format, including but not limited to product information; financial information; internal procedures and operations; marketing information and strategy; information regarding existing and potential customers; information on suppliers and sources with which the Company does business, including affiliates of suppliers and sources; the Company's manner of operation, strategies and plans; software, including all source and object code, whether completed or in development; inventions, whether or not patented or patentable; discoveries;

---

2.  The record contains a document signed by Whitchurch and a separate document signed by Davis.  Aside from the dates and signatures, the two documents appear to be identical.

3.  Kurimura's title is listed on Whitchurch's confidentiality agreement as "Office Manager" and on Davis' confidentiality agreement as "Manager, Corp Services & HR."

improvements; processes; and other
proprietary and commercial information.

The confidentiality agreements further provided, in

relevant part:

Employee . . . acknowledges that all
Confidential Information is required to be
maintained in confidence for the continued
success of the Company and its business.
Therefore, Employee covenants and agrees
that Employee will not disclose any
Confidential Information to anyone who is
not employed by the Company or who does not
have a reasonable need to know such
Confidential Information, either directly or
indirectly, during the Service Term, or at
any time thereafter, nor will Employee,
directly or indirectly, use or permit others
to use Confidential Information for any
purpose other than in discharging Employee's
duties as an employee for the exclusive
benefit of the Company.

In addition, the agreements set forth an employee's

obligations upon separation from Vizant:

At the end of the Service Term, Employee
shall deliver to the Company, and shall not
keep in his or her possession nor deliver to
anyone else, the originals or copies,
whether hard copies or electronic copies, of
any and all Confidential Information.
Employee agrees to cooperate with Company in
all procedures that Company may adopt to
assure that no Confidential Information is
retained on computers and storage media
belonging to or used by Employee.

The confidentiality agreements included a section

entitled "Non-competition and Non-solicitation."  In relevant

part, that section stated:

2.1.1  During the period beginning on the Effective Date and ending on the date that is two years following the termination of the Service Term, Employee shall not, directly or indirectly, anywhere in the United States or any other geographic area in which Company markets or has marketed its products or services during the one-year period preceding the end of the Service Term:

2.1.1.1  Encourage any employee to terminate his or her employment with the Company . . . or in any way interfere with the Company's relationship with its employees;

2.1.1.2  Encourage or induce any customers or suppliers of the Company to terminate business activities with the Company;

2.1.1.3  engage in any diversion of good-will regarding the business as conducted by the Company; [or]

2.1.1.4 otherwise engage in the Business or assist any person or entity that engages in the Business.

The term "Business" was defined as "the business of the Company as conducted by the Company (including any business for which the Company has devoted meaningful development activities) during the period from the Effective Date until the end of the Service Term."

A section of the confidentiality agreements made clear that they are to be "governed and construed in accordance with the internal laws of the State of Delaware without regard to its choice or conflicts of law provisions."

-8-

Both Whitchurch and Davis also signed acknowledgments that they had received a copy of Vizant's employee handbook. That handbook stipulated that "[a]fter separation from employment (voluntary or involuntary), employees are expected to return to [Vizant] all confidential information, materials, property and equipment in their possession."

Upon being promoted to the position of National Director of Business Development in July 2013, Whitchurch had responsibility for the supervision of a team of Vizant salespeople. She reported directly to Bizzarro, the CEO. Among the members of her team were Davis and an individual named Elizabeth Aeron Sharp ("Sharp"). Sharp, who now serves as Vizant's National Director of Business Development, recounted that during the time she was supervised by Whitchurch, the relationship between Whitchurch and Bizzarro was strained. In conversations with members of her sales team, Whitchurch referred to Bizzarro as an "asshole" and characterized him as a difficult person with whom to work. Whitchurch also restricted the ability of members of her team to communicate directly with Vizant's upper management. For example, when Sharp asked Whitchurch to help her "move up the ladder" and to assist her in making a connection with Bizzarro, Whitchurch declined to put the two in contact.

Over the course of the summer and early fall of 2013, Vizant experienced some cash flow issues at least in part because of nonpayment by a large client.  Around this time, Bizzarro made a sizable non-interest-bearing loan to Vizant.  He also personally guaranteed a loan at the request of a Vizant lender.  On occasion during this period, Vizant's payroll and some commissions of its salespeople were slightly delayed. Whitchurch received complaints and pleas from some of her salespeople as a result.

In summer 2013, certain payments by Vizant to its employees' health insurance provider were also slightly delayed. At least some employees received a notice from the insurer indicating that their coverage had been cancelled.  One or more employees faced temporary difficulty in obtaining coverage for prescriptions and medical appointments.  Whitchurch, upon becoming aware of the issue, communicated the concerns of members of her team to Bizzarro and to Vizant's human resources department.  The evidence demonstrates that ultimately there was no gap in any coverage, and there is nothing in the record to show that any employee was actually forced to pay any medical expenses due to the coverage problems.

In October 2013, Vizant's upper management made the decision to demote Whitchurch to Regional Sales and Business Development Manager.  Accordingly, her salary was reduced by

$10,000 annually.  Whitchurch testified that she was never made aware of this demotion, and that it was her belief that she remained Vizant's National Director of Business Development until the date of her termination.  Whitchurch did continue to represent herself until her termination as National Director of Business Development, including on at least one email sent to Bizzarro.

In early December 2013, Whitchurch phoned Michael Mikulski ("Mikulski"), a former Vizant employee, and told him that members of Vizant upper management were committing fraud. Mikulski informed Seidman, the chair of Vizant's board, of the call, and Seidman in turn relayed the information to Wiggers, a board member.  Wiggers contacted Mikulski, who recounted that Whitchurch had made accusations of fraud, failure to pay employees, and the existence of a Ponzi scheme.  Within approximately one day of speaking to Mikulski, Wiggers contacted Whitchurch, who made similar accusations directly to him.  After instructing Whitchurch that she should contact human resources about any payroll and benefits concerns, Wiggers spoke with Seidman.  The two agreed that Wiggers should interview Bizzarro without informing him of what Whitchurch had said.

Wiggers then initiated a conversation with Bizzarro. He first asked Bizzarro whether Vizant was considering termination of any of the company's employees.  Bizzarro

-11-

immediately identified both Whitchurch and Davis.  Wiggers then
interviewed Bizzarro about the alleged malfeasance described by
Whitchurch.  Wiggers also conducted a similar interview with
Jablonski, Vizant's chief financial officer, who identified
Whitchurch as a likely candidate for termination.  Ultimately,
Wiggers found no evidence of fraud or of a Ponzi scheme and
concluded that Whitchurch was simply a disgruntled employee.  He
reported his conclusions to Vizant's board of directors.

On December 4, 2013, within approximately one day of
the conclusion of Wiggers' investigation, Whitchurch was
discharged from her position at Vizant.  Davis was fired the
next day.  The reasons for defendants' termination are not made
entirely clear in the record.  However, the court heard credible
testimony that Whitchurch had, prior to her termination, clashed
with her superiors over the proper use of her company-issued
credit card.  When Whitchurch's expenses exceeded the credit
card limits imposed by Vizant, Davis apparently permitted
Whitchurch to use her company-issued credit card.

Immediately after terminating Whitchurch, Vizant sent
her a letter reminding her of her obligations under the
confidentiality agreement which she had signed.  In response, on
December 5 Whitchurch sent an email from her Gmail account to
Vizant's counsel as well as to Bizzarro, Wiggers, and Seidman in
an apparent attempt to provide proof of her accusations of

-12-

illegality.  Attached to the email were:  a marked-up copy of the letter Vizant had sent to Whitchurch immediately after her termination; a letter from Whitchurch re-hashing her accusations and challenging the statements in Vizant's letter; and PDF and Word files entitled "Promotion Announcement," "Whitchurch National Director Offer," "Grave concerns," "16 payroll emails," "Health insurance emails," "5 more payroll emails," "Inflated cost reduction reports," and "Amazon gift cards."

Although none of the attachments to the email appeared to bolster the allegations levied by Whitchurch, Wiggers decided to enlist Vizant's outside counsel and Vizant's in-house counsel to conduct an independent review.  The reports which resulted from these investigations left Wiggers and the rest of the board satisfied that no fraud or Ponzi scheme had taken place. Vizant's independent auditors have also given Vizant a clean audit report for the relevant year.  In sum, there is no evidence in the record demonstrating the existence of any fraud, Ponzi scheme, or criminal activity by Bizzarro or anyone who is a part of Vizant's upper management as charged by defendants.

In addition to her assertions that members of Vizant's upper management were engaged in fraud and a Ponzi scheme, Whitchurch, following her termination, claimed that Vizant owed her money including money for accrued paid time off and for out-of-pocket expenses Whitchurch had paid.  Whitchurch

maintains that when Vizant did attempt to pay her for this accrued time, she was improperly paid at her reduced post-demotion salary rather than at her National Director salary.  As of the hearing on Vizant's motion for a preliminary injunction, Whitchurch still contends that Vizant owes her at least $15,000.

In the days following her termination, Whitchurch returned to Vizant a company laptop computer which had been issued to her.  However, the defendants retained additional Vizant-issued property, including Davis' laptop and a printer. In the meantime, claiming that defendants had not returned all confidential information in their possession and in response to certain communications initiated by Whitchurch and Davis, Vizant filed suit against Whitchurch and Davis in the Superior Court of Cobb County in Georgia (the "Georgia action").  Vizant's complaint in the Georgia action included claims of defamation, tortious interference with business relations, and misappropriation of trade secrets.  Within days of filing that complaint, Vizant moved for a temporary restraining order and a preliminary injunction against Whitchurch and Davis.  Vizant sought to prevent the two from retaining and disseminating any confidential information and to bar them from "communicating with, threatening, intimidating and harassing Vizant's employees, officers and directors and **their family members**."

-14-

(Emphasis in original.)  At the January 2014 hearing in Georgia on that motion, Whitchurch delivered to Vizant's counsel: Davis' Vizant-issued laptop computer; a printer; a bin containing documents, a cell phone, and a flash drive; and a second box containing marketing materials.  Ultimately, the state court granted Vizant's motion for a temporary restraining order and then a preliminary injunction in the Georgia action.

In or around early January 2014, Whitchurch entered into discussions with SIB Development & Consulting, Inc. ("SIB"), another cost reduction firm, about taking a sales position with that company.  According to Vizant, SIB is its direct competitor.  Whitchurch states that all of her conversations with SIB took place by telephone.  Whitchurch ultimately entered into a sales agreement with SIB.  However, she terminated her relationship with the company almost immediately thereafter, upon realizing that in working for SIB she would likely be violating her confidentiality agreement with Vizant.

On or about January 17, 2014, a little over a month after they were terminated, Whitchurch and Davis launched a website, www.nocapitalsolutions.com (the "website").  The website was still active as of April 15, 2015, the date the hearing began on Vizant's instant motion.  Vizant, Bizzarro, Seidman, and Wiggers are all referenced by name.  Nowhere,

-15-

however, does the website mention the name of either Whitchurch
or Davis, its creators.

The contents of the website are central to Vizant's
pending motion for a preliminary injunction.  Whitchurch, as the
author of some of the website's content, states on the site that
she was "National Director of Business Development, for a
private company which is owned by Capital Solutions, INC" and
that she "reported directly to the CEO, *Joseph Bizzarro*.  He
reports directly to the Vizant Technologies Board, which is
comprised of *Frank Seidman, Lane Wiggers, and Dick Corl.*"
(Italics in original.)  The website's text continues:

> For over 8 months, I watched Joseph Bizzarro
> withhold sales reps [sic] commissions,
> withhold alliance partners [sic]
> commissions, over bill the clients, pay
> employees late, terminate employees that
> asked for their owed monies, not pay his
> vendors, not pay the employee's [sic] health
> insurance preimum [sic].  Seriously, this
> guy is a real pig.
>
> . . .
>
> Frank Seidman and Lane Wiggers are the guys
> that get the money from people like you, to
> invest in companies like this, they have a
> legal fiduciary duty to put your money's
> best interest before their own.  They have
> not.
>
> . . .
>
> You can't imagine how much money (investor's
> money) they've spent in an effort to get
> this website down and stop me from saying
> "Frank, you're not doing your job.  Frank,

-16-

> you hired a monkey as the CEO of one of your
> portfolio companies.  Frank, that same
> monkey put two other companies into
> bankruptcy.  Frank, pay me the $15+K owed."
> If I had to guess, I'd say Frank has spent
> close to $100K of his investors [sic] money.
> I wonder do they know.  Pathetic.

The website additionally contains the following text:

> EXHIBIT in a court of law.  If you're a
> past/present employeee [sic] or a
> past/present investor, and it comes to you
> suing these jackasses for owed wages or a
> breach of fiduciary duty, know that I will
> make myself available for depositions and
> trial.  You can reach me anytime at
> joebizzarrowhereismymoney@yahoo.com.

The text of the website also includes an abundance of profanity

and name-calling directed at Bizzarro, including the statement:

"The F*cking Monkey is Joseph N Bizzarro, the CEO of Vizant

Technologies."

The website contains what appears to be the full text

of the letter directed to Seidman, Bizzarro, Wiggers and

Vizant's counsel which Whitchurch had attached to her

December 5, 2013 email to them.  That letter declares that

Vizant had failed to pay its employees and that it had caused

their insurance to be cancelled, and that "there is no clarity

or credibility in Sr Mgmt" of Vizant.  In addition, it asserts

that Vizant failed to pay some of its vendors.  The letter goes

on:

> Does no one have a fiduciary duty to ring
> the alarm when they see and can prove gross

-17-

> financial misconduct by C level Executives
> . . . ?  I've rung the alarm internally for
> 5 months with numerous emails, phone calls
> and face to face meetings. . . . I could and
> will quote the CFO verbatim telling me how
> hard it was to come up with a lie for the
> employees every 2 weeks as to why payroll
> is/was late and or missing. . . . What a
> pansy.
>
> . . .
>
> I do have very strong, disparaging feelings
> for Joe [Bizzarro].  I believe he has no
> moral floor, no moral compass, he's a liar,
> and he's a cheat.
>
> There is little doubt in my mind that he has
> "enhanced" his reporting to the board so the
> true financial state of the company is far
> more positive than the reality."

The letter incorporated on the website additionally makes numerous references to the fact that Whitchurch has copies of Vizant's internal emails and that she has retained numerous cost reduction reports.  It declares:  "I have attached 10 recent Cost Reduction reports . . . I think it's . . . safe to assume that the numbers you are receiving are just as inflated as the numbers on these reports."  The actual content of the cost reduction reports is apparently not accessible to viewers of the website.

The website includes a message which is directed to Seidman, Vizant's board chair.  It states in relevant part:

> It's now been 6 months since I made you
> aware of your culpable neglect hiring of
> Joseph Bizzarro.  You are well aware he's a

fraud, his resume and credentials are
fabricated, he's bankrupted (or played a
major role in the bankruptcy) of two of his
previous employers, and he's a pathological
liar.  Vizant continues to decline under his
leadership, or lack there of [sic].  Sales
have steadly [sic] declined, there isn't
enough money in reserve for ADP to run the
payroll, sales reps havent [sic] received
their expense checks in months, commissions
aren't being paid, Alliance Partners arent
[sic] being paid and if they are, it is far
less than what they're owed, and customers
are being over billed.

Again Frank [Seidman], stop thinking about
FRANK.  Start thinking about your investors,
employees, and clients.  FIRE HIM [referring
to Bizzarro].

Bankrupting Vizant can't be that far off,
WTF are you going to tell the investors
then?  You could tell them "we were never
able to maximize our square footage."  That
was his reasoning for bankrupting Reading
China.  What a monkey, what does that even
mean, sounds like code for "I don't know
what the f*ck I'm doing because I'm a
monkey."

. . .

Frank, YOU'RE IN GROSS BREACH OF YOUR
FIDUCIARY DUTIES TO THE INVESTORS OF VIZANT
TECHNOLOGIES.

The website has a section dedicated to debunking

Bizzarro's resume.  The website also recites a message to

potential investors in Vizant:  "If you've given these guys your

money to invest, you might want to check on it.  Two of these

men are in gross breach of their fiduciary duties to their

investors."  The same section of the website refers to Seidman

-19-

as "a jackass" and to Wiggers as "the biggest ass of all."  An
additional section characterizes Vizant as "litigious" and lists
a number of lawsuits in which the company has been involved.

Defendants' website appends copies of a number of the
defendants' filings in the Georgia state court.  Among the
Georgia filings replicated on the website is defendants'
Memorandum in Opposition to Plaintiff's Notice of Voluntary
Dismissal without Prejudice, which states in relevant part:

> For the past ten (10) months [Vizant], Frank
> Seidman, Lane Wiggers, Joseph Bizzarro, Dick
> Corl, Jonathan Kalman, and the law firm of
> Elarbee Thompson [Vizant's counsel in the
> Georgia action] have engaged in a vicious,
> calculated, and illegal conspiracy to
> accuse, frame, and victimize the defendants.
> They have manufactured evidence, extorted
> the Defendants, committed perjury and
> subornation of perjury, threatened a
> witness, and sought the illegal
> incarceration of the Defendants.

Finally, defendants' website,
www.nocapitalsolutions.com, contains links to a series of videos
created by Whitchurch and uploaded to YouTube.  These videos
depict Whitchurch going about her daily routine while engaged in
lengthy and expletive-laden monologues (repeatedly using the "F"
word) to "Frank" (presumably Seidman) about the money she claims
she is owed.  While Whitchurch's image is not identifiable in
any of these videos, her voice is.

-20-

The preliminary injunction granted by the Cobb County Superior Court in July 2014 in favor of Vizant required, among other things, that defendants "immediately deliver to the Court all copies of Plaintiff's confidential information and internal communications."  In response to this order, and unbeknownst to Vizant and its counsel, Whitchurch delivered to the clerk of the Cobb County Superior Court a batch of hard-copy documents, all of which the clerk stamped, scanned, and entered into that court's publicly-accessible docketing system.  The documents are not accessible online but can be viewed by any individual who searches for them on the computer at the Cobb County Courthouse. Vizant is currently taking steps to have the documents sealed.

Following the issuance of the preliminary injunction in the Georgia action, Vizant filed in October 2014 a motion for contempt against defendants on the grounds that they had harassed Vizant's officers and directors in violation of the injunction.  While its motion was pending, however, Vizant filed a notice of voluntary dismissal in the Georgia action.  It elected instead to institute the instant action.  Pursuant to Vizant's notice, the state court dismissed the Georgia action in February 2015.

At an evidentiary hearing on the motion now before us, we heard detailed credible testimony on the continuing impact on Vizant of defendants' conduct, particularly as a result of

-21-

defendants' website.  Defendants' actions are causing
significant and continuing harm to Vizant and its upper-level
management, especially Bizzarro.  The website and defendants'
other conduct have damaged and are damaging Vizant's
relationship with its employees and the relationship between its
board and its CEO, and have impeded the company's ability to
secure investors and clients.  Bizzarro, as CEO of the company,
has had to spend countless hours addressing defendants' attacks.
While the board of directors still has confidence in Bizzarro,
their relationship has become more difficult as a result of
defendants' conduct.

Defendants' behavior also impacts Vizant's employees.
Members of Vizant's sales team are being compelled to expend
time and effort reassuring clients and potential clients about
the company's trustworthiness.  As Sharp stated, the website
undermines the credibility of the promise made by members of her
sales team to prospective clients that Vizant values
confidentiality.  The salespeople whom Sharp supervises still
discuss the website and the statements contained therein have a
detrimental impact on their morale.  One individual ended his
professional relationship with Vizant and Capital Solutions
after defendants threatened to join him as a party in litigation
pertaining to their claims.

The evidence establishes that defendants have retained materials and information from their tenure at Vizant, with the result that the trust placed in Vizant by its clients and potential clients has faltered.  Much of this material constitutes "confidential information" within the meaning of Vizant's confidentiality agreements, and some also constitutes trade secrets.  Specifically, Whitchurch and Davis declare on their website that they are in possession of at least ten cost reduction reports.  Indeed, Whitchurch admitted at the hearing that the reports reside in their email accounts as attachments to previously-sent messages.  By accessing her Gmail account, Whitchurch is still able to call up those messages and the attached PDF scans of cost reduction reports.  Whitchurch and Davis have also apparently forwarded internal communications of Vizant employees and management to their own personal email accounts, including accounts the existence of which they have not disclosed to plaintiffs in connection with this matter or with the Georgia action.

David Yarnall ("Yarnall"), an expert in computer forensic examinations, testified at the hearing about his findings as to the material Whitchurch and Davis still have in their possession.  At the request of Vizant, Yarnall conducted an examination of the two Vizant-owned laptop computers which defendants used during their employment with the company and

which they returned to Vizant following their termination.
Yarnall also reviewed a USB "thumb drive" which was delivered by
Whitchurch to Vizant's Georgia-based counsel in January 2014.

        Among Yarnall's conclusions was a determination made
to a reasonable degree of scientific certainty that a thumb
drive, two printers, and two iPhones were plugged in to
Whitchurch's corporate laptop on the day of, or after, her
termination.  Yarnall also opined that files were accessed and
removed from Whitchurch's corporate laptop during this process.
According to Yarnall's testimony and report, the thumb drive
which was inserted into Whitchurch's laptop and used to remove
files on or after the date of her termination has not been
returned to Vizant.  Instead, Whitchurch returned to Vizant a
thumb drive different from the one which was inserted into her
laptop on the day of, or after, her termination.

        Significantly, Yarnall also concluded to a reasonable
degree of scientific certainty that defendants still retain
Vizant-related files on at least one additional computer.
Yarnall was able to draw this conclusion through his examination
of the returned thumb drive, which, according to his
examination, had been connected to an unknown laptop.  While
Yarnall was not able to see the contents of the retained files,
he was able to view the file names, several of which identified
the retained files as containing cost reduction reports and

-24-

internal Vizant communications.  He was also able to view the
dates on which the files were transferred.  Yarnall did concede
that the dates corresponding to the removal of files from the
devices were based upon the computer's clock.  By manually
changing the date on the computer, Yarnall stated, a user could
change the apparent date of file removal.  There is no evidence,
however, that the dates were manipulated.

In short, Yarnall's examination illustrated that at
least one unknown thumb drive and at least one unknown laptop
still contain Vizant files, at least some of which contain
confidential information.  Neither of these unknown devices has
been returned to Vizant.

Perhaps most significantly, the conduct of defendants
has strained Vizant's relationships with its existing clients
and compromised its ability to secure new business.  Vizant has
put forth evidence that at least one of its potential clients,
West Capital Management, ended its involvement with the company
after becoming aware of defendants' website.  Vizant points to
an email sent by Chris Topolewski ("Topolewski") of West Capital
Management to Wiggers.  In that email, Topolewski states:

> I am not able to recommend you working with
> our firm given the information that is
> published about you and the work that you
> are associated with.  Last week I received a
> linkedin invite to "no capital solutions"
> and with the invite was a link to
> www.nocapitalsolutions.com.  We reviewed the

> website and the accusations in the site.
> Even though you and I spoke about the site,
> I am not able to recommend using your
> services to clients or to my partners unless
> the accusations in the site are resolved.

Wiggers testified that although West Capital Management had at
that point made no formal offer to invest in Vizant, he and
Topolewski, a longtime acquaintance of Wiggers, had engaged in
extensive discussions about working together.  It is a fair
inference that defendants' conduct caused the rupture.

Additional Vizant clients and prospective clients have
seen defendants' website, and Vizant employees and officers have
had to spend time addressing these clients' concerns as a
result.  Amtrak, which is now Vizant's client, raised concerns
about the website during the contract negotiations between the
two companies.  After Bizzarro contacted Amtrak's
representatives to reassure them, Vizant was ultimately able to
secure Amtrak's business but was forced to drop its compensation
rate in the process.  Bizzarro also testified that the treasurer
of another company which uses Vizant's services contacted him
about defendants' website.  Sharp recounted that a prospective
client with which she was communicating, Tacoma Screw Products,
asked her about the website and expressed concern about
defendants' accusations.  Tacoma Screw Products has not enlisted
the services of Vizant, and Sharp has credibly concluded that it

declined to do so because the website led the company to doubt
that Vizant would keep its information confidential.

Finally, defendants have also reached out directly to
at least one Vizant client.  A representative of Cox
Communications, one of Vizant's larger clients, received a
LinkedIn communication in March 2014 from Whitchurch, who listed
herself on the networking site as affiliated with Vizant.  The
representative informed a Vizant employee of the communication,
saying of Whitchurch, "I don't want her misrepresenting Vizant
online."

                                II.

Vizant, as noted above, seeks a preliminary injunction
against Whitchurch and Davis in connection with its claims for
breach of contract, misappropriation of trade secrets, tortious
interference with existing and prospective contractual
relations, and defamation.

In seeking a preliminary injunction, a plaintiff has
the burden of persuasion, by a clear showing, since a
preliminary injunction is a drastic remedy.  Mazurek v.
Armstrong, 520 U.S. 968, 972 (1997) (internal quotation marks
and citation omitted).  A preliminary injunction should be
granted only if the plaintiff can establish:  "(1) a likelihood
of success on the merits; (2) that it will suffer irreparable
harm if the injunction is denied; (3) that granting preliminary

                               -27-

relief will not result in even greater harm to the nonmoving

party; and (4) that the public interest favors such relief."

Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir.

2004).  A preliminary injunction is inappropriate if the

plaintiff fails to establish any element in its favor.  P.C.

Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore,

LLC, 428 F.3d 504, 508 (3d Cir. 2005).

III.

Vizant has met its burden of showing a likelihood of

success on the merits of its breach of contract claim.  As

discussed above, each defendant, as an employee of Vizant,

entered into a multi-faceted confidentiality agreement with

Vizant which provided in relevant part:

> 2.1.1  During the period beginning on the
> Effective Date and ending on the date that
> is two years following the termination of
> the Service Term, Employee shall not,
> directly or indirectly, anywhere in the
> United States or any other geographic area
> in which Company markets or has marketed its
> products or services during the one-year
> period preceding the end of the Service
> Term:
>
> 2.1.1.1  Encourage any employee to terminate
> his or her employment with the Company . . .
> or in any way interfere with the Company's
> relationship with its employees;
>
> 2.1.1.2  Encourage or induce any customers
> or suppliers of the Company to terminate
> business activities with the Company; [or]

-28-

2.1.1.3  engage in any diversion of good-
will regarding the business as conducted by
the Company.

Pursuant to their confidentiality agreements, defendants also

agreed to surrender all "confidential information" belonging to

Vizant upon their separation from the company, with

"confidential information" defined as

any of the proprietary or confidential
information, technical data, trade secrets
or know-how of the Company, in any form or
format, including but not limited to product
information; financial information; internal
procedures and operations; marketing
information and strategy; information
regarding existing and potential customers;
information on suppliers and sources with
which the Company does business, including
affiliates of suppliers and sources; the
Company's manner of operation, strategies
and plans; software, including all source
and object code, whether completed or in
development; inventions, whether or not
patented or patentable; discoveries;
improvements; processes; and other
proprietary and commercial information.

The agreements additionally barred defendants from "disclos[ing]

any Confidential Information to anyone who is not employed by

[Vizant] or who does not have a reasonable need to know such

Confidential Information, either directly or indirectly, during

the Service Term, or at any time thereafter" and from "directly

or indirectly . . . us[ing] or permit[ting] others to use

Confidential Information for any purpose other than in

discharging Employee's duties as an employee for the exclusive

benefit of" Vizant.  As noted above, the agreements provide that
they are to be governed and construed in accordance with
Delaware law.

       In order to succeed on a breach of contract claim
under Delaware law, a plaintiff "must prove: '1) a contractual
obligation; 2) a breach of that obligation by the defendant; and
3) a resulting damage to the plaintiff.'"  In re G-I Holdings,
Inc., 755 F.3d 195, 202 (3d Cir. 2014) (quoting H-M Wexford LLC
v. Encorp, Inc., 832 A.2d 129, 140 (Del. Ch. 2003)).  Defendants
do not dispute that their confidentiality agreements with Vizant
give rise to a contractual obligation.

       The record makes clear that defendants breached the
contractual obligations that arose from the confidentiality
agreements.  First, defendants have failed to relinquish all
"confidential information" belonging to Vizant upon their
separation from the company.  Specifically, they have retained
access to at least ten cost reduction reports, as well as
numerous internal emails.  The cost reduction reports clearly
constitute "confidential information" as defined in the
confidentiality agreements.  These reports include "trade
secrets or know-how of the Company" in the form of the
calculations and recommendations contained therein, and they
contain "information regarding existing and potential
customers."  Similarly, the internal emails retained by

-30-

defendants contain, at a minimum, "information on suppliers and sources with which the Company does business."

We also note that defendants are in breach of their contractual obligations in that they "directly or indirectly . . . use[d] . . . Confidential Information for any purpose other than in discharging Employee's duties as an employee for the exclusive benefit of" Vizant." Specifically, defendants used their website www.nocapitalsolutions.com to notify the world and Vizant's clients, potential clients, investors, potential investors, and employees that they still possessed cost reduction reports containing highly confidential information. Defendants knew, as former employees, that disclosure of their possession of these reports would be harmful to Vizant and its clients.

Defendants are also in breach of the provisions of their confidentiality agreements which prohibited defendants from [e]ncourag[ing] any employee to terminate his or her employment with" Vizant or "interfer[ing] with [Vizant's] relationship with its employees," from "[e]ncourag[ing] or induc[ing] . . . customers or suppliers . . . to terminate business activities with" Vizant and from "engag[ing] in an diversion of good-will regarding" Vizant's business for two

years following their separation from the company.[4]  Defendants'
website and their retention of confidential information have
interfered with Vizant's relationship with its employees.  Sharp
confirmed that these developments damaged morale among members
of her team and that the employees whom she supervises still
discuss the website, while Wiggers explained that at least one
individual terminated his professional relationship with Vizant
as a result of defendants' actions.  We are also persuaded that
in publishing their website, defendants have "[e]ncourage[d] or
induce[d] . . . customers . . . of [Vizant] to terminate
business activities with the Company."  Several Vizant clients
have raised concerns about the website and about defendants' use
of social media.  Finally, defendants have "engage[d] in [a]
diversion of good-will" regarding Vizant.  Specifically, their
website has damaged Vizant's credibility and trustworthiness,
and sales representatives have consequently been forced to
expend time and effort reassuring clients about the company's
commitment to confidentiality.  As discussed above, defendants'
statements on their website, www.nocapitalsolutions.com, have
become a source of concern among Vizant's existing clients.  The

---

4.  We are mindful that insofar as any injunction is premised
exclusively on the conduct barred by these provisions, it would
necessarily terminate two years after defendants' separation
from the company.  However, any conduct enjoined as tortious
interference with existing or prospective contractual relations
or as misappropriation of trade secrets is not subject to a
two-year limitation.

record also shows that prospective clients have declined to do business with Vizant because of the website.  In sum, the evidence is overwhelming that defendants have breached the contractual obligations arising from their confidentiality agreements.

Vizant has established a likelihood of success on the third requirement of its breach of contract claim, that is, the requirement that it show damages.  As discussed above, Vizant has lost business in some cases because of defendants' interference with its relationships and diversion of good-will. In others, Vizant has been forced to reduce its compensation rate in order to persuade concerned customers to use its services.  Meanwhile, Vizant has been harmed by the damage done to the morale of sales representatives by defendants' interference with its relationships with its employees.  The diversion of good-will caused by defendants' actions has also forced members of Vizant's upper-level management, particularly Bizzarro, to expend time and effort reassuring investors and board members about the company's solvency and trustworthiness.

It seems to be defendants' position that any breach of their contractual obligations is justified by the truth of their accusations about Vizant and its officers.  Defendants, and Whitchurch in particular, apparently view themselves as whistleblowers.  For example, defendants state in their Response

-33-

to Plaintiffs [sic] Motion for Preliminary Injunction (doc.
# 41) that "Whitchurch stands firm in her statements that
Bizzarro was committing insurance fraud, stealing from employees
and partners, and terminating employees in retaliation."

When employees or former employees have brought their
concerns about unlawful conduct of their employers to the
attention of law enforcement, some courts have declined on
public policy grounds to enforce contractual confidentiality and
non-compete provisions against them.  See, e.g., Siebert v. Gene
Sec. Network, Inc., No. 11-cv-01987, 2013 WL 5645309, at *8
(N.D. Cal. Oct. 16, 2013); U.S. ex rel. Ruhe v. Masimo Corp.,
929 F. Supp. 2d 1033, 1039 (C.D. Cal. 2012); U.S. ex rel. Head
v. The Kane Co., 668 F. Supp. 2d 146, 152 (D.D.C. 2009).  We
need not reach the applicability of such a public policy
exception here.  Defendants' conduct of which Vizant complains
does not entail any reporting to law enforcement.  Nor have
defendants presented any evidence that Bizzarro or Vizant has
committed fraud or other illegal activity or even engaged in
unethical conduct as set forth on the website.  Defendants have
also grossly exaggerated and indeed falsified the issue of late
wage payments and cancellation of health insurance with the
intent to harm Vizant.  Defendants, as disgruntled former
employees, have elected to air on their website and through
social media, in breach of their contractual obligations,

-34-

unsubstantiated accusations of misconduct and illegality. Defendants' effort to excuse their conduct based on their perceived whistleblower status is without merit.

Similarly, Vizant is likely to succeed on the merits of its misappropriation of trade secrets claim. We note at the outset that Vizant has pleaded this claim under Delaware law, presumably pursuant to the terms of each confidentiality agreement, which states: "This agreement shall be governed and construed in accordance with the internal laws of the State of Delaware without regard to its choice or conflicts of law provisions." Broadly-phrased provisions like the one contained in the confidentiality agreements are deemed to encompass "all tort claims that may arise from the [a]greement." Sullivan v. Sovereign Bancorp., Inc., 33 F. App'x 640, 642 (3d Cir. 2002). In any event, the DUTSA, Del. Code Ann. tit. 6, §§ 2001 et seq., is virtually identical to its Pennsylvania counterpart, the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa. Cons. Stat. Ann. §§ 5301 et seq.

In order to prevail on a misappropriation of trade secrets claim under the DUTSA, a plaintiff must establish the following elements:

> [T]he [a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," or alternatively, the "[d]isclosure or use of a trade secret of

-35-

another without express or implied consent"
by a person who either: (1) acquired the
secret by improper means; (2) knew or had
reason to know that their knowledge of the
trade secret was (A) derived by another who
acquired it by improper means, (B)
"[a]cquired under circumstances giving rise
to a duty to maintain its secrecy or limit
its use," or (C) acquired by accident or
mistake.

Mattern & Assocs., L.L.C. v. Seidel, 678 F. Supp. 2d 256, 269

(D. Del. 2010) (internal citations omitted) (alternations in

original).[5] "Trade secret," in turn, is defined by the DUTSA as:

information, including a formula, pattern,
compilation, program, device, method,
technique or process, that:

a.  Derives independent economic value,
actual or potential from not being generally
known to, and not being readily
ascertainable by proper means by, other
persons who can obtain economic value from
its disclosure or use; and

b.  Is the subject of efforts that are
reasonable under the circumstances to
maintain its secrecy.

6 Del. Code Ann. § 2001(4); see also Mattern & Assocs., L.L.C.,

678 F. Supp. 2d at 269.

Defendants, as employees involved in Vizant's business

development, clearly had a duty to maintain the secrecy of the

---

5.  Pennsylvania courts, applying a similar approach to PUTSA
claims, require plaintiffs to show that a defendant has
"acquire[d] knowledge of another's trade secret in circumstances
giving rise to a duty to maintain its confidentiality and then
disclose[d] or use[d] that trade secret without the other's
consent."  Bimbo Bakeries USA, Inc. v. Botticella, 613 F.3d 102,
110 (3d Cir. 2010).

financial and other internal business information of Vizant
clients beyond the dates of their termination.  Following their
termination defendants retained, at minimum, copies of cost
reduction reports generated by Vizant and relating to Vizant
clients.  The information set forth in these materials clearly
constitutes "trade secrets" as defined in § 2001(4) of the
DUTSA.  The cost reduction reports retained by defendants
contain information reflecting Vizant's expertise and its
understanding and analysis of both its clients' data and the
methodologies and procedures of credit card companies.  The
information contained in the cost reduction reports is not known
by or readily ascertainable by the general public.  Clients are
insistent that information they provide to Vizant is for its
eyes only.  Consequently, that information "[d]erives
independent economic value, actual or potential from not being
generally known to, and not being readily ascertainable by
proper means by, other persons who can obtain economic value
from its disclosure or use."  See 6 Del. Code Ann. § 2001(4).

      The material is also the subject of reasonable efforts
to maintain its secrecy.  See id.  These efforts include
Vizant's requirement that all of its employees, including its
CEO, sign confidentiality agreements which apply to the same
type of information.  Vizant has also undertaken extensive
network security measures.

-37-

Having concluded that the cost reduction reports constitute trade secrets, we also find that Vizant is likely to succeed on the merits of its claim for misappropriation of those trade secrets.  These secrets were "use[d] . . . without [the] express or implied consent" of Vizant when defendants took advantage of their retention of the materials to threaten plaintiffs on their website.  See Mattern, 678 F. Supp. 2d at 269.  Defendants also "acquired the secret[s] by improper means," that is, by retaining them in violation of their confidentiality agreements following their termination.  See id. Defendants' conduct further satisfies an alternative element of DUTSA:  both Whitchurch and Davis "knew or had reason to know that their knowledge of" Vizant's trade secrets was "[a]cquired under circumstances giving rise to a duty to maintain [the secrets'] secrecy or limit [their] use," those circumstances being Vizant's confidentiality agreements.  See id.  Defendants' conduct as recounted at the evidentiary hearing constitutes misappropriation of trade secrets within the meaning of DUTSA, and Vizant is likely to succeed on the merits of that claim.

Furthermore, Vizant has shown that it is likely to succeed on the merits of its claim of tortious interference with existing and prospective relationships.  As discussed above, we will apply Delaware law to this claim, which is sufficiently

related to the confidentiality agreements.  See Sullivan, 33 F. App'x at 642.

Delaware courts have adopted the approach to tortious interference found in the Restatement (Second) of Torts.  ASDI, Inc. v. Beard Research, Inc., 11 A.3d 749, 751 & n.3 (Del. 2010).  Accordingly, a plaintiff seeking to establish tortious interference with a contractual relationship under Delaware law must satisfy the requirements set forth in § 766 of the Restatement,  for "Intentional Interference with Performance of Contract by Third Person."  A plaintiff must show the existence of "(1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury."  Anderson v. Wachovia Mortg. Corp., 497 F. Supp. 2d 572, 583 (D. Del. 2007).

A related section of the Restatement (Second) of Torts, § 766A, applies to situations in which a defendant renders a plaintiff's performance of his own contract "more expensive or burdensome."  While the Delaware Supreme Court has not had occasion to pass upon § 766A, a Delaware Superior Court, in a well-reasoned opinion, has recently endorsed it.  Allen Family Foods, Inc. v. Capital Carbonic Corp., 2011 WL 1295138, at *5 (Del. Super. Ct. Mar. 31, 2011); but see Anderson, 497 F. Supp. 2d at 583.  We predict that the state's Supreme Court

-39-

would do the same.  See Nationwide Mut. Ins. Co. v. Buffetta, 230 F.3d 634, 637 (3d Cir. 2000).

Finally, Delaware courts recognize liability for wrongful interference with *prospective* contractual relations as set forth in § 766B of the Restatement.  Empire Fin. Servs., Inc. v. Bank of N.Y., 900 A.2d 92, 98 (Del. 2006).  Such liability requires proof of "(a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages."  Id. at 98 n.19 (quoting DeBonaventura v. Nationwide Mut. Ins. Co., 428 A.2d 1151, 1153 (Del. 1981)).

The evidence presented at the evidentiary hearing supports Vizant's tortious interference claim.  Specifically, a reasonable probability that West Capital Management would establish a business relationship with Vizant ended because a representative of West Capital Management became aware of defendants' website.  From the explicit warnings on defendants' website directed at those who would do business with Vizant, we infer that any interference with prospective relationships like the one between Vizant and West Capital Management was intentional.  The actions complained of were also carried out by defendants without justification.  Although defendants have made bald statements that Vizant and Bizzarro had cheated and shortchanged the company's employees, investors, and clients and

-40-

that Bizzarro and other officers had engaged in criminal conduct
and other malfeasance, they have not come forward with any
credible evidence that any of their accusations are true.  Their
statements have either no basis in fact or are gross
exaggerations with the intent to mislead.  Their conduct, in a
word, is without justification and is simply the vindictive
behavior of two disgruntled former employees.  Finally, it is
clear that Vizant experienced resulting damages in that it lost
the opportunity to secure West Capital Management as an
investor.  The testimony presented at the hearing also makes
clear that other investors and clients who were likely to do
business with Vizant have declined to do so because of the
accusations publicized by defendants.

Taken together, the foregoing evidence and
considerations establish a likelihood that Vizant will succeed
on a claim for tortious interference with existing and
prospective contractual relationships under Delaware law.

The record also establishes a likelihood that Vizant
will succeed in showing that defendants' actions made the
performance of contracts to which Vizant was a party more
burdensome.  Specifically, as a result of defendants'
accusations Bizzarro was required to expend time explaining
himself to the Board of Directors and regaining the trust of its
members, a process which compromised the contract between

-41-

Bizzarro and Vizant.  The same is true of the contracts between Vizant and its sales personnel, many of whom have expended a great deal of energy in reassuring their clients about Vizant's trustworthiness.  Vizant's performance of its contracts with its existing clients has also become more burdensome, as Vizant representatives have found it necessary to divert resources toward the maintenance of these relationships in light of defendants' actions.  Specifically, representatives of Amtrak expressed concern about the website and as a result Vizant was forced to lower its compensation rate in order to secure Amtrak's business.

Even if Pennsylvania law, and not Delaware law, were to apply here, we conclude that the result would be no different.  Pennsylvania recognizes tortious interference with existing or prospective contractual relationships where a plaintiff is able to prove:

> (1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) legal damage to the plaintiff as a result of the defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference.

Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 212
(3d Cir. 2009) (citing Brokerage Concepts, Inc. v. U.S.
Healthcare, Inc., 140 F.3d 494, 530 (3d Cir. 1998)).  Vizant is
likely to succeed on the merits of its claim under this
framework.  The record demonstrates the existence of contractual
relationships between Vizant and Bizzarro, between Vizant and
its customers, and a prospective contractual relationship
between Vizant and a potential investor such as West Capital
Management.  The defendants took purposeful action, in the form
of the representations made on their website, to harm these
relationships and prevent new ones from occurring.
Specifically, the text of the website urged Vizant to fire
Bizzarro, and warned customers and investors against doing
business with Vizant.

        Defendants have put forth no evidence that they were
privileged or justified in taking these actions.  Vizant has
shown legal damage, most notably in the form of lost business,
lost investments, and the time expended by Vizant's officers and
employees in mending relationships within the company and
between the company and its clients.  Finally, with respect to
prospective contracts such as that between Vizant and West
Capital Management, the testimony of Wiggers credibly showed a
reasonable likelihood that the relationship would have occurred
but for the actions of defendants.  Vizant is likely to succeed

-43-

on the merits of its claim of tortious interference with
existing and prospective contractual relationships under
Pennsylvania law as well as under Delaware law.

Finally, Vizant bases the instant motion on its
defamation claim.  In support of this claim, Vizant points to
the statements, among others, made by defendants that it
overbilled its clients, inflated financial reports, and was
headed for bankruptcy.  Vizant also focuses on defendants'
statements that fraud including a Ponzi scheme exists within
Vizant and is being caused by Bizzarro, its CEO.  Finally,
Vizant draws our attention to defendants' averments that
Bizzarro is a "liar and . . . a cheat" who has committed theft,
fraud, perjury and subornation of perjury, among other criminal
offenses.[6]  Again, we note that defendants have presented no
evidence to prove the truth of any of these statements.

---

6. Words imputing a criminal offense constitute defamation per
se under both Pennsylvania and Delaware law.  E.g., Synergy,
Inc. v. Scott-Levin, Inc., 51 F. Supp. 2d 570, 580 (E.D. Pa.
1999); Spence v. Funk, 396 A.2d 967, 970 (Del. 1978).  This type
of defamation is actionable without proof of special damages.
E.g., Spence, 396 A.2d 970.  At a minimum, defendants'
statements that Bizzarro has committed theft, fraud, perjury,
and subornation of perjury would fall into this category if
plaintiffs were to satisfy the other necessary elements of a
defamation claim.

According to the Restatement (Second) of Torts, a defendant can
defame a corporation by making defamatory allegations against
its "officers, agents or stockholders [which] also reflect
discredit upon the method by which the corporation conducts its
business."  Restatement (Second) of Torts § 561 cmt. b.  To the

We need not reach the issue whether it is appropriate to enjoin any defamation preliminarily when it is not coupled with a breach of contract or related tort.  See, e.g., Kramer v. Thompson, 947 F.2d 666, 673 (3d Cir. 1991); see also Puello v. Crown Heights Shmira, Inc., No. 3:14-0954, 2014 WL 3115156 (M.D. Pa. July 7, 2014).  In any event, all of the conduct which serves as the basis for Vizant's defamation claim is an integral part of its claim for breach of contract and tortious interference with existing and prospective contractual relations.[7]  The defamation count is not critical to the issuance of injunctive relief here.

IV.

We next address whether Vizant will suffer irreparable harm if its motion for a preliminary injunction is denied.  See Kos Pharms., Inc., 369 F.3d at 708.  A plaintiff seeking to demonstrate irreparable harm must show "potential harm which cannot be redressed by a legal or an equitable remedy following a trial.  The preliminary injunction must be the *only* way of

---

extent that defendants' statements about Bizzarro "reflect discredit upon the method by which [Vizant] conducts its business" and satisfy the remaining elements of a defamation claim, they constitute defamation against Vizant.  See id.

7.   Our Court of Appeals recently endorsed such an approach, affirming the issuance of a preliminary injunction on a tortious interference claim which overlapped substantially with a defamation claim.  Bancroft Life & Cas. ICC, Ltd. v. Intercontinental Mgmt. Ltd., 456 F. App'x 184, 189-90 (3d Cir. 2012).

protecting the plaintiff from harm." Campbell Soup Co. v.
ConAgra, Inc., 977 F.2d 86, 91 (3d Cir. 1992) (internal citation
omitted).  The plaintiff has the burden of "proving a clear
showing of immediate irreparable injury." Id. (internal
citation and quotation marks omitted).

Vizant has met its burden of demonstrating that it
will suffer "immediate irreparable injury" if defendants are not
enjoined from making the derogatory references on their website
of which Vizant complains.  See Campbell Soup Co., 977 F.2d at
91.  Vizant will also be injured if we do not enjoin defendants'
use of Vizant's trade secrets and confidential information.
Potential Vizant customers and investors will become concerned
when they discover that a former Vizant employee has alleged
criminal activity within Vizant and that Vizant cannot protect
their confidential information.  Vizant's officers and sales
representatives will consequently be called upon to expend time
and effort reassuring these entities, and may be forced to
reduce Vizant's compensation rate.  Some potential customers who
discover defendants' website will likely decline to do business
with Vizant altogether.  Likewise, members of Vizant's team will
continue to be forced to expend company resources in reassuring
existing customers who become aware of defendants' assertions.
These harms are virtually impossible to quantify and "cannot be

redressed by a legal or an equitable remedy following a trial."
See id.

V.

We now inquire whether a grant of preliminary
injunctive relief will result in even greater harm to the
nonmoving party.  See Kos Pharms., Inc., 369 F.3d at 708.  We
see no way in which defendants will be harmed by the injunctive
relief granted today.  Insofar as defendants' conduct is
calculated to persuade Vizant to pay them the money they claim
they are owed, an injunction will not interfere with their
ability to use proper means to obtain redress.  The benefit of
granting of a preliminary injunction will clearly outweigh any
harm to the defendants.

VI.

Finally, we ask whether the public interest favors
injunctive relief in this instance.  See Kos Pharms., Inc., 369
F.3d at 708.  There is clearly a strong public interest in
enforcing valid contractual obligations like the ones arising
from Vizant's confidentiality agreements, in preventing
misappropriation of trade secrets and in stopping tortious
interference with contractual or prospective contractual
relations, particularly with respect to the flagrant manner
employed by Whitchurch and Davis.  Accordingly, the public

-47-

interest strongly favors the injunctive relief to be granted here.