IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

VIZANT TECHNOLOGIES, LLC,       :            CIVIL ACTION
et al.                          :
                                :
        v.                      :
                                :
JULIE P. WHITCHURCH, et al.     :            NO. 15-431

MEMORANDUM

Bartle, J.                                      January 8, 2016

Plaintiffs Vizant Technologies, LLC ("Vizant") and its chief executive officer ("CEO") Joseph Bizzarro ("Bizzarro") have filed this action against Julie P. Whitchurch ("Whitchurch") and Jamie Davis ("Davis"), both of whom are former Vizant employees.  Plaintiffs' ten-count complaint alleges:  two violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968; breach of contract; misappropriation of trade secrets in violation of the Delaware Uniform Trade Secrets Act ("DUTSA"), Del. Code Ann. tit. 6, §§ 2001 et seq.; defamation; tortious interference with existing and prospective contractual relationships; abuse of process; conversion; fraud; and civil conspiracy.[1]

_____

1.  The claims of breach of contract, misappropriation of trade secrets, and conversion are brought by Vizant alone against both defendants.  Both plaintiffs bring the remaining counts against both defendants.

We have subject matter jurisdiction over plaintiffs' RICO claims under 28 U.S.C. § 1331 and supplemental jurisdiction over their remaining claims under 28 U.S.C. § 1367.[2]

In April 2015, in response to a motion by Vizant and after a hearing, we issued a preliminary injunction against both defendants.  See Preliminary Injunction dated April 29, 2015 (Doc. # 60).  Plaintiffs subsequently claimed that defendants had violated that injunction.  This prompted a second hearing which resulted in a finding that defendants were in contempt.  See Order dated June 2, 2015 (Doc. # 82).  The court sanctioned defendants by ordering them to reimburse Vizant for the legal fees and costs it had incurred in connection with the contempt proceedings.  Each defendant was also ordered to pay a sanction of $300 for each day of noncompliance with the preliminary injunction, starting on June 3, 2015.  This sanction was never implemented as defendants came into compliance with the preliminary injunction before June 3, 2015.

Now before the court is the motion of plaintiffs for summary judgment on the claims for breach of contract, violations of DUTSA, tortious interference with existing and prospective contractual relationships, and defamation; a final money judgment; and issuance of a permanent injunction.

---

2.  It also appears that there is diversity of citizenship under 28 U.S.C. § 1332(a).

Defendants have also filed a cross-motion for summary judgment on all ten of plaintiffs' claims.

I.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).[3] A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). Summary judgment is granted where there is insufficient record evidence for a reasonable factfinder to find for the nonmovant. Id. at 252. "The mere existence of a scintilla of evidence in

---

2.  Rule 56(c)(1) states:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find" for that party.  Id.

When ruling on a motion for summary judgment, we may only rely on admissible evidence.  See, e.g., Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 95 (3d Cir. 1999).  We view the facts and draw all inferences in favor of the nonmoving party. In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).  However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment."  Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990).

A party asserting that a particular fact "cannot be or is genuinely disputed" must support its assertion by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  In reviewing a motion for summary judgment, the court may consider any materials in the record but is not required to look beyond those materials cited by the parties.  Fed. R. Civ. P. 56(c)(3).

It is not the responsibility of the court to "comb the record in search of disputed facts."  N.J. Carpenters Pension Fund v. Hous. Auth. & Urban Redevelopment Agency of the City of Atl.

City, 68 F. Supp. 3d 545, 549 (D.N.J. 2014).  Our Court of Appeals has emphasized that "[j]udges are not like pigs, hunting for truffles buried in briefs."  Doeblers' Pa. Hybrids, Inc. v. Doebler, 442 F.3d 812, 820 n.8 (3d Cir. 2006) (quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)).

II.

The following facts are undisputed.[4]  Vizant is a financial consulting firm organized under the laws of Delaware with its principal place of business in Chadds Ford, Pennsylvania.  At all times relevant hereto, Vizant's CEO has been plaintiff Bizzarro and its chief financial officer has been David Jablonski ("Jablonski").  Its three-member Board of

---

4.  Defendants object to much of the factual background relied on by plaintiffs on the ground that it is taken from plaintiffs' complaint.  That complaint was accompanied by a "verification" by plaintiff Bizzarro that the matters set forth therein were "true and correct to the best of [his] knowledge, information and belief."  The "verification" also contained the statement "under penalty of perjury that the foregoing statements made by me are true."  While a verified complaint may serve as part of the summary judgment record, it must be made under penalty of perjury and "based on personal knowledge."  See, e.g., Hart v. Hairston, 343 F.3d 762, 765 (5th Cir. 2003); Moran v. Selig, 447 F.3d 748, 759 n.16 (9th Cir. 2006); Lantac, Inc. v. Novell, Inc., 306 F.3d 1003, 1019 10th Cir. 2002).  "Knowledge, information and belief" statements such as the one contained in Bizzarro's verification do not establish personal knowledge.  E.g., Hicks v. Baines, 593 F.3d 159, 167 (2d Cir. 2010); Boyer-Liberto v. Fontainebleau Corp., 752 F.3d 350, 355 (4th Cir. 2014), rev'd on other grounds en banc, 786 F.3d 264 (4th Cir. 2015); Doe v. Aliquippa Hosp. Ass'n, No. 93-570, 1994 WL 579843, at *3 (W.D. Pa. Sep. 29, 1994).  The facts set forth herein appear elsewhere in the record and are not taken from the complaint.

Directors includes its chair Frank Seidman ("Seidman") as well as Lane Wiggers ("Wiggers").

Vizant is owned in part by Capital Solutions, Inc. ("Capital Solutions"), an entity founded by Seidman which is engaged to monitor various portfolio companies.  Vizant is among those companies monitored by Capital Solutions.  Wiggers is a former Capital Solutions employee.  Vizant works with clients in both the for-profit and nonprofit sectors and operates on a national level.

Among other things, Vizant's expertise lies in identifying strategies for its clients to reduce the costs and fees associated with inbound payments such as the percentages clients are charged by credit card companies.  Vizant develops these strategies by assessing its clients' finances and then applying its knowledge of the operating methodologies of credit card companies.  It can take up to several months for Vizant to complete its initial process of collecting a client's financial data.

Once it has finished gathering data from a client, Vizant conducts a detailed assessment of this information and generates a document known as a "cost reduction report."  Each cost reduction report contains background information about the client, including its sales and volume of inbound credit card payments.  The cost reduction report then provides comprehensive

information about the relevant costs being incurred by the client at the time the report is generated and defines "cost reduction opportunities."  These "opportunities" are essentially Vizant's recommendations as to how the client can reduce the charges associated with processing incoming credit card payments.  These recommendations are in part the result of Vizant's negotiations with credit card providers to lower the client's rates.  The recommendations also stem from Vizant's analytical processes, for which the company holds several patents.  Vizant is paid on a "results basis," that is it shares with its clients any savings they obtain by implementing the recommendations identified by Vizant in the cost reduction report.

Vizant treats its methodologies, strategies, client information, pricing practices, and internal financial data as sensitive and highly confidential.  It does so because its clients have an interest in ensuring that their own financial information is not disclosed to their competitors.  Likewise, Vizant has an interest in keeping confidential the rates it negotiates with its various clients and with credit card companies on its clients' behalf.

For these reasons, Vizant goes to great lengths to maintain the confidentiality of the contents of its cost reduction reports as well as its methodology and its pricing

strategies.  For example, the company restricts the means
through which customers may submit data and maintains a robust
network security infrastructure.  In addition, Vizant requires
all of its employees to sign agreements governing the use and
distribution of information generated by the company.

Vizant hired defendant Julie Whitchurch in August 2011
as a Business Development Manager, a sales position.  Whitchurch
was later promoted to the supervisory role of National Director
of Business Development.  Her sister, defendant Jamie Davis,
became a Vizant employee in May 2012, also in the role of
Business Development Manager.  At all relevant times both
defendants resided in Georgia.

Each defendant, upon commencing her employment with
Vizant, signed a document styled "Confidentiality,
Non-Competition and Assignment Agreement"[5] (the "employment
agreement").  The agreements contained detailed provisions
regarding the handling of material that Vizant considered
confidential.  They defefined "Confidential Information" as
follows:

> "Confidential Information" means any of the
> proprietary or confidential information,
> technical data, trade secrets or know-how of
> the Company, in any form or format,

---

5.  The record contains a document signed by Whitchurch and a
separate document signed by Davis.  Aside from the dates and
signatures, the two documents appear to be identical.

including but not limited to product
information; financial information; internal
procedures and operations; marketing
information and strategy; information
regarding existing and potential customers;
information on suppliers and sources with
which the Company does business, including
affiliates of suppliers and sources; the
Company's manner of operation, strategies
and plans; software, including all source
and object code, whether completed or in
development; inventions, whether or not
patented or patentable; discoveries;
improvements; processes; and other
proprietary and commercial information.

The employment agreements further provided in relevant

part:

Employee . . . acknowledges that all
Confidential Information is required to be
maintained in confidence for the continued
success of the Company and its business.
Therefore, Employee covenants and agrees
that Employee will not disclose any
Confidential Information to anyone who is
not employed by the Company or who does not
have a reasonable need to know such
Confidential Information, either directly or
indirectly, during the Service Term, or at
any time thereafter, nor will Employee,
directly or indirectly, use or permit others
to use Confidential Information for any
purpose other than in discharging Employee's
duties as an employee for the exclusive
benefit of the Company.

In addition, the agreements set forth an employee's

obligations upon separation from Vizant:

At the end of the Service Term, Employee
shall deliver to the Company, and shall not
keep in his or her possession nor deliver to
anyone else, the originals or copies,
whether hard copies or electronic copies, of

any and all Confidential Information.
Employee agrees to cooperate with Company in
all procedures that Company may adopt to
assure that no Confidential Information is
retained on computers and storage media
belonging to or used by Employee.

The employment agreements included a section entitled

"Non-competition and Non-solicitation."  In relevant part, that

section stated:

2.1.1  During the period beginning on the
Effective Date and ending on the date that
is two years following the termination of
the Service Term, Employee shall not,
directly or indirectly, anywhere in the
United States or any other geographic area
in which Company markets or has marketed its
products or services during the one-year
period preceding the end of the Service
Term:

2.1.1.1  Encourage any employee to terminate
his or her employment with the Company . . .
or in any way interfere with the Company's
relationship with its employees;

2.1.1.2  Encourage or induce any customers
or suppliers of the Company to terminate
business activities with the Company;

2.1.1.3  engage in any diversion of good-
will regarding the business as conducted by
the Company; [or]

2.1.1.4 otherwise engage in the Business or
assist any person or entity that engages in
the Business.

The term "Business" was defined as "the business of the Company

as conducted by the Company (including any business for which

the Company has devoted meaningful development activities)

during the period from the Effective Date until the end of the Service Term."

A section of the employment agreements specified that they were to be "governed and construed in accordance with the internal laws of the State of Delaware without regard to its choice or conflicts of law provisions."  They also provided for contract damages:  "Should it become necessary for the Company or Employee to file suit to enforce the covenants or other provisions contained herein, the prevailing party shall be entitled to recover, in addition to all other damages provided for herein, the costs incurred in conducting the suit, including reasonable attorneys' fees."

Upon being promoted in July 2013, Whitchurch reported directly to Bizzarro.  Among the salespeople supervised by Whitchurch were defendant Davis and Elizabeth Aeron Sharp ("Sharp"), who now serves at Vizant's National Director of Business Development.  Shortly after Whitchurch was promoted, Vizant began to experience cash flow issues.  Vizant's payroll and certain commissions to salespeople were slightly delayed on occasion during this period.  Several of the salespeople supervised by Whitchurch contacted her to complain about the delayed payment of these funds.  At around the same time, certain payments by Vizant to its employees' health insurance provider were slightly delayed.  As a result, some employees

-11-

received notices from the insurer indicating that their coverage had been cancelled.  At least one employee faced temporary difficulty in obtaining coverage for certain medical services. Upon learning of this, Whitchurch conveyed the concerns of her team members to Bizzarro and to Vizant's human resources staff.

In early December 2013, Whitchurch phoned a former Vizant employee and told him that members of Vizant's upper management were engaged in fraud.  The former employee reported the conversation to Seidman, who in turn relayed the information to Wiggers.  Shortly thereafter, Wiggers contacted Whitchurch, who repeated her accusations directly to him.  She insisted that Vizant's management team was engaging in fraud, neglecting to pay its employees, and maintaining a Ponzi scheme.[6]  Wiggers directed Whitchurch to contact human resources about any payroll and benefits concerns.  He then spoke to Bizzarro and Jablonski, who denied the allegations.  Jablonski also informed him that

---

6.  Black's Law Dictionary defines a "Ponzi scheme" as a

> fraudulent investment scheme in which money
> contributed by later investors generates
> artificially high dividends or returns for
> the original investors, whose example
> attracts even larger investors.  Money from
> the new investors is used directly to repay
> or pay interest to earlier investors,
> usu[ally] without any operation or revenue-
> producing activity other than the continual
> raising of new funds.

Ponzi scheme, Black's Law Dictionary (10th ed. 2014).

Whitchurch was a likely candidate for termination.  Wiggers reported to the Board of Directors that he had conducted an investigation and had found no evidence of fraud or of a Ponzi scheme.  He also communicated his conclusion that Whitchurch was merely a disgruntled employee.

On December 4, 2013, within approximately one day after Wiggers' investigation ended, Whitchurch was discharged from her position at Vizant.  Davis was fired the next day.

On December 5, 2013, Vizant's outside counsel, Bruce Kasten ("Kasten"), sent Whitchurch a "cease and desist" letter. That letter stated that Whitchurch had been terminated the prior day "for poor performance and inappropriate conduct."  It went on:

> Shortly thereafter, you called the Company's President, Joseph Bizzarro, and left a voice mail message threatening to contact all of Vizant's customers and partners for the purpose of "badmouthing" Vizant, including the comment that you intended to "make my way through the customer list and call people and act like a 'crazy woman.'"  You also admitted that you have already "trashed" Vizant to current employees, and the Company has received numerous reports today that you contacted Company employees and made disparaging comments to them about the Company and Joe personally.  Finally, you sought to interfere with the relationship between the President of Vizant and the Company's Board of Directors in an attempt to induce the Company to breach its contract with the President.

The letter demanded that Whitchurch "immediately cease and desist from making additional threats or making disparaging comments regarding Vizant, its personnel, and its business."

Within a day or two,[7] in response to the "cease and desist" letter, Whitchurch sent a letter directed to Kasten, Bizzarro, Seidman, and Wiggers.  The letter stated in relevant part:

> Yes, Yes, I reached out to the board.  Yes, I am still reaching out to the Board.  YES, this is me screaming from the mountain top. Houston we have a problem!!!!!!!!!!!!!  Does no one have a fiduciary duty to ring the alarm when they see and can prove gross financial misconduct by C Legel Executives, in private as well as public companies? . . . I could and will quote the CFO verbatim telling me how hard it was to come up with a lie for the employees every 2 weeks as to why payroll is/was late and or missing. . . . I am just as mortified today as I was sitting in his office listening to him whine about having to come up with a lie every 2 weeks.  What a pansy.

The email continued:

> Should I have continued to watch us use vendors [sic] services, with no intention of paying them? . . . Should I have continued to do nothing and watch him [apparently Bizzarro] play the "float" with things as important as our health insurance? . . . Should I have continued to let him fire employees that asked too many times for their owed commissions? . . . Should I have not continued to take the calls and emails for our Alliance Partners that we're not

---

7.  It is not clear whether Whitchurch sent this letter on December 5, 2013 or on December 6, 2013.

paying?  Should I just do what Joe
[Bizzarro] does, ignore the call, make up a
story about being on a plane, being in an
all-day meeting, leave a voicemail after
hours . . . [?]

Of Bizzarro, Whitchurch added:

I believe he has no moral floor, no moral
compass, he's a liar, and he's a cheat.
There is little doubt in my mind that he has
"enhanced" his reporting to the board so the
true financial state of the company is far
more positive than the reality. . . .
[L]ying is engrained in his person, and it
is who he is.

Whitchurch also claimed in her email that she had

"attached 10 recent Cost Reduction reports."

Whitchurch again emailed members of Vizant's Board on

January 2, 2014.  Her email stated in relevant part:

I'm Julie Whitchurch and up until Dec 4th I
was the National Director of Business
Development at Vizant.  I'm going to forward
you several emails, it should bring you up
to speed.

The cliff notes:

- You've got a monkey as the CEO of
  Vizant
- The monkey is burning the people's
  money. (not his money, not your money,
  the investor's [sic] money)
- I reached out to Frank & Lane to report
  the GROSS and ILLEGAL financial
  misconduct of the monkey.
- I was terminated 3 hours later
- My sister, Jamie Davis, was terminated
  8 hours later
- Frank is complacent
- Lane is scrambling to cover his ASSet

-15-

. . .

[Frank], Joe, and Lane have wronged Jamie
and me in ways that would be
incomprehensible to any reasonable person.
You have behaved shamefully, despicable
[sic], and quite possibly, illegally.

On January 5, 2014, Whitchurch emailed

Bizzarro and members of Vizant's Board yet again.  She

wrote:

Below you will find an email from a Vizant
sales rep asking Joe, the equivalent of
"where are my commissions, where is the
money you owe me" and Joe's reply "you're
unprofessional, and fired".

ILLEGAL

Joe, how long was [the sales rep] with the
company, 5+ years? . . . You fucking idiot.
Who do you think pays for that piece of
shit, Mike the "situation" worthy, bedazzled
truck of your [sic] ???  Not you, not
strolling into the office at 9:30 and out by
5:00.  You arrogant fool, no CEO (no human
being) that has any decency goes out and
buys a new car when they cant [sic] pay
their employees.  You know what your troops
are/were thinking... "nice truck asshole,
where's my money."

The next day, Davis sent an email to a list of

recipients that included Seidman, Wiggers, Whitchurch, and

various employees of Vizant.  Among other things, she wrote:

Do you realize that you have let this monkey
destroy a perfectly respectable and viable
company? . . . Have y'all read the article
on Vizant's "VP and LEGAL COUNSEL", Dave
Askinas? . . . Really?  This is who is

-16-

advising the company in legal matters?  This
is who they had ILLEGALLY fire me and
Julie?? . . . Lane, are you at all familiar
with the internet?  Are you not completely
appalled and embarrassed?? Because you
should be…you definitely should be.  I
shudder to think how much you have "earned"
for "watching" that asset. . . . You payed
[sic] $500K of your investors' hard-earned
money for a fucking name change?! . . . What
the fuck is wrong with you people??
Regardless of what that clown Joe Bizzarro
has said about Julie or me, we have proven
beyond a shadow of a doubt that he is a
liar…and cannot drive a car…and I am sure
that he does not have the incriminating
emails that we have to back up whatever
horse shit he's trying to peddle…THE TONS
AND TONS of incriminating emails that we
have…seriously gentlemen, we could write a
novel…a good one. . . . [S]o far everyone
that I've told this story to, and I do mean
EVERYONE, can't believe that you have
treated us so poorly…Julie did you a favor
you arrogant pricks.  But instead, you
decide to let the both of us be fired (by
the way, I have 4 month old twins, a 2 year
old, and a 10 year old, so FUCK YOU) and
keep letting that idiot burn through
whatever money is left…you people are
disgusting.  I am determined to put a stop
to you all letting that monkey ruin people
(and not just Vizant's employees but it's
[sic] shareholders as well) because you
jackasses didn't do your due diligence…I am
determined to get this story and these
emails out to the general public through
whatever news and social media outlet I
can…I am going to blog, tweet, Facebook and
Instagram this story until this matter gets
some attention…I am going to keep adding
people onto these email chains so that your
colleagues know exactly what kind of people
they are getting in bed with when they work
with Capital Solutions.  I wonder what
general public opinion is going to
be…however, gauging from the 30 or so people

-17-

I have already told, the public shares my
and Julie's opinion.

On January 8, 2014, Kasten sent a "cease and desist"
letter to Davis.  In it, Kasten noted that Davis had sent an
"unsolicited communication to members of Vizant's Board of
Directors, to whom . . . Bizzarro directly reports."  Kasten
recounted the contents of the January 6, 2014 email sent by
Davis.  Kasten demanded that Davis "immediately cease and desist
from making additional threats or making disparaging comments
regarding Mr. Bizzarro, Mr. Askinas and Vizant, its personnel
and its business."  Kasten also demanded that Davis return to
Vizant her company-issued laptop computer and certain other
materials that she purportedly had in her possession.

Also on January 8, 2014, Whitchurch sent an email to a
group of recipients including Seidman, Wiggers, and Kurimura.
She threatened to "stop by [Vizant's] offices" and stated that
she intended to "[s]hame you into doing the right/legal thing
using phone calls, emails, and in person visits"; "[t]ell my
story at www.nocapitalsolutions.com purchased the website
yesterday).  Hope that I . . . can reach the investors through
the website, instagram, linkedin, twitter, and/or facebook.
Hope that anyone that is considering giving Frank/Cap Solutions
a $ to invest, will think twice."

True to their word, defendants launched a website, www.nocapitalsolutions.com (the "website"), on or about January 17, 2014.  The site referenced Vizant, Bizzarro, Seidman, and Wiggers by name.  Nowhere, however, did the website mention the name of either Whitchurch or Davis, its creators.

Whitchurch, as the author of some of the website's content, stated on the version of the site that was live as of March 12, 2015 that she was "National Director of Business Development for a private company which is owned by Capital Solutions, INC" and that she "reported directly to the CEO, *Joseph Bizzarro*.  He reports directly to the Vizant Technologies Board, which is comprised of *Frank Seidman, Lane Wiggers, and Dick Corl.*" (Italics in original.)  The website's text continued:

> For over 8 months, I watched Joseph Bizzarro withhold sales reps [sic] commissions, withhold alliance partners [sic] commissions, over bill the clients, pay employees late, terminate employees that asked for their owed monies, not pay his vendors, not pay the employee's [sic] health insurance preimum [sic].  Seriously, this guy is a real pig.
>
> After 8 months, 328 emails addressing these concerns, and too many conversations with the CEO, CFO and HR to count, I reached out to help. . . . I was fired within 3 hours.  My sister, who also worked for Vizant and who had just returned from maternity leave, was terminated the next day.  Seriously, these men are pigs.

. . .

Frank Seidman and Lane Wiggers are the guys
that get the money from people like you, to
invest in companies like this, they have a
legal fiduciary duty to put your money's
best interest before their own.  They have
not.

. . .

You can't imagine how much money (investor's
money) they've spent in an effort to get
this website down and stop me from saying
"Frank, you're not doing your job.  Frank,
you hired a monkey as the CEO of one of your
portfolio companies.  Frank, that same
monkey put two other companies into
bankruptcy.  Frank, pay me the $15+K owed."
If I had to guess, I'd say Frank has spent
close to $100K of his investors [sic] money.
I wonder do they know.  Pathetic.

The website additionally contained the following text:

EXHIBIT in a court of law.  If you're a
past/present employeee [sic] or a
past/present investor, and it comes to you
suing these jackasses for owed wages or a
breach of fiduciary duty, know that I will
make myself available for depositions and
trial.  You can reach me anytime at
joebizzarrowhereismymoney@yahoo.com.

Defendants also declared:  "The F*cking Monkey is Joseph N

Bizzarro, the CEO of Vizant Technologies."

Defendants reprinted on their website the text of

several of the emails they had sent to Vizant's leadership and

investors, including the letter sent by Whitchurch in response

to Kasten's "cease and desist" letter making reference to

defendants' retention of Vizant's cost reduction reports.  The

-20-

actual content of the cost reduction reports was apparently not accessible to viewers of the website.  Defendants also quoted from "an email to Frank around late Jan 2014" which had purportedly stated:  "I would expect that everyone would tell the truth.  Fuck Frank, that's what I've been counting on.  The truth.  These are libel statements, I'm holding you liable, personally. . . . Seriously, I think you're breaking PA Law just by saying [Dave Askinas is] 'general counsel.'"

The website also contained the text of at least one email apparently sent by Bizzarro to several Vizant employees. On the website, defendants had annotated the text of the email, calling Bizzarro's statements into question.  They had added remarks such as:  "You have no intention of paying the full commissions, never have"; "You Lie, and Lie, and Lie"; and "I'm calling you out, you're a liar & a cheat Joe Bizzarro."

In addition, the website included a message apparently directed to Seidman.  It stated in relevant part:

It's now been 6 months since I made you
aware of your culpable neglect hiring of
Joseph Bizzarro.  You are well aware he's a
fraud, his resume and credentials are
fabricated, he's bankrupted (or played a
major role in the bankruptcy) of two of his
previous employers, and he's a pathological
liar.  Vizant continues to decline under his
leadership, or lack there of [sic].  Sales
have steadly [sic] declined, there isn't
enough money in reserve for ADP to run the
payroll, sales reps havent [sic] received
their expense checks in months, commissions

-21-

aren't being paid, Alliance Partners arent
[sic] being paid and if they are, it is far
less than what they're owed, and customers
are being over billed.

Again Frank [Seidman], stop thinking about
FRANK.  Start thinking about your investors,
employees, and clients.  FIRE HIM [referring
to Bizzarro].

Bankrupting Vizant can't be that far off,
WTF are you going to tell the investors
then?  You could tell them "we were never
able to maximize our square footage."  That
was his reasoning for bankrupting Reading
China.  What a monkey, what does that even
mean, sounds like code for "I don't know
what the f*ck I'm doing because I'm a
monkey."

. . .

Frank, YOU'RE IN GROSS BREACH OF YOUR
FIDUCIARY DUTIES TO THE INVESTORS OF VIZANT
TECHNOLOGIES.

In the same section of the site, defendants stated:

Joseph, [y]ou've got no moral compass.
You're an embarrassment to Vizant.  You've
single handly [sic] ruined that company.
There is noone [sic] else to blame, it's
you.  You're the problem, you've been the
problem from the beginning.  You're a fraud.

Defendants also stated on their website that shortly

after the site was created, "we launched a Direct Mail campaign,

postcards.  This made their blood boil. . . . I didn't get the

response I was looking for; my money.  So, I got on a plane and

headed that way . . . ."  This statement about "my money" was in

apparent reference to the claim made by defendants on a number

of occasions following their termination that Vizant owed them
money, including compensation for accrued paid time off and
reimbursement for expenses they had paid out of pocket.

The website had a section dedicated to debunking
Bizzarro's resume.  It also recited a message to potential
investors in Vizant:  "If you've given these guys your money to
invest, you might want to check on it.  Two of these men are in
gross breach of their fiduciary duties to their investors."  The
same section of the site referred to Seidman as "a jackass" and
to Wiggers as "the biggest ass of all."  An additional section
characterized Vizant as "litigious" and listed a number of
lawsuits in which the company has been involved.

Another section of the website addressed the topic of
Ponzi schemes.  It asserted:  "I'm pretty sure that at least one
of Capital Solution's [sic] portfolio companys [sic] is
dangerously close to fitting the bill."

Finally, defendants' website contained links to a
series of videos created by Whitchurch and uploaded to YouTube.
These videos depicted Whitchurch going about her daily routine
while engaged in lengthy and expletive-laden monologues
(repeatedly using the "F" word) to "Frank" (presumably Seidman)
about the money she claims she is owed.  The videos also made
reference to a purported Ponzi scheme.  While Whitchurch's image
was not identifiable in any of these videos, her voice was.

-23-

Defendants have not disputed that both of them maintained control over the website such that either defendant could upload and edit material.  Nor have they disputed that they are jointly responsible for all of the online material at issue.  During her testimony before the court in April 2015, Whitchurch stated that she is "the person that posts and updates the information on the website."  She later reiterated:  "It is my website."  Davis, when asked whether she "approve[s] of everything that's on the [website] and has been on the [website] along with Ms. Whitchurch," responded in the affirmative.

In the days following her termination, Whitchurch returned to Vizant a company laptop computer which had been issued to her.  However, the defendants retained for some time additional Vizant-issued property, including Davis' laptop and a printer.

In the meantime, claiming that defendants had not returned all confidential information in their possession and in response to certain communications initiated by Whitchurch and Davis, Vizant filed a lawsuit (the "Georgia action") against them in the Superior Court of Cobb County in Georgia in January 2014.  Vizant's complaint in the Georgia action included claims of defamation, tortious interference with business relations, and misappropriation of trade secrets.  Within days of filing that complaint, Vizant moved for a temporary restraining order

-24-

and a preliminary injunction against Whitchurch and Davis in the
Georgia state court.  Vizant sought to prevent the two from
retaining and disseminating any confidential information and to
bar them from "communicating with, threatening, intimidating and
harassing Vizant's employees, officers and directors and **their
family members**."  (Emphasis in original.)

     At the January 2014 hearing in Georgia on Vizant's
motion for a preliminary injunction, Whitchurch delivered to
Vizant's counsel:  Davis' Vizant-issued laptop computer; a
printer; a bin containing documents, a cell phone, and a flash
drive; and a second box containing marketing materials.
Ultimately, the Georgia state court granted Vizant's motion for
a temporary restraining order and then a preliminary injunction.

     During the months following their termination,
defendants continued to contact Vizant's leadership and board
members.  For example, they sent postcards to the home of
Bizzarro making negative comments about him and about the
company.  On or about September 16, 2014, Bizzarro received a
postcard which displayed a photograph of him next to photographs
of monkeys, along with the words "This is not over yet Joe
Bizzarro.  You are a monkey and liar."  Another postcard
addressed to Bizzarro's home contained the words "I know Joe
Bizzarro to be a liar."  Wiggers also received what he later
described as "multiple contacts of . . . many e-mails, postcards

to my home . . . all sorts of disparaging remarks." The emails Wiggers received from defendants "used a lot of foul language and . . . called everybody names and said we were a fraud and that we were a Ponzi scheme." Seidman also received a postcard at his home, and recalled that the postcards he had seen "were not nice. They were not pleasant."

Following the issuance of the preliminary injunction in the Georgia action, Vizant filed in October 2014 a motion for contempt against defendants on the ground that they had harassed Vizant's officers and directors in violation of the injunction. While its motion was pending, however, Vizant filed a notice of voluntary dismissal in the Georgia action. It elected instead to institute the instant action in the Eastern District of Pennsylvania. Pursuant to Vizant's notice, the state court dismissed the Georgia action in February 2015.

Defendants, meanwhile, appended to their website copies of a number of documents that had already been filed in Georgia state court. Among the filings replicated on the website was defendants' "Memorandum in Opposition to Plaintiff's Notice of Voluntary Dismissal without Prejudice," which stated in relevant part:

> For the past ten (10) months [Vizant], Frank
> Seidman, Lane Wiggers, Joseph Bizzarro, Dick
> Corl, Jonathan Kalman, and the law firm of
> Elarbee Thompson [Vizant's counsel in the
> Georgia action] have engaged in a vicious,

-26-

calculated, and illegal conspiracy to
accuse, frame, and victimize the defendants.
They have manufactured evidence, extorted
the Defendants, committed perjury and
subornation of perjury, threatened a
witness, and sought the illegal
incarceration of the Defendants.

Defendants also appended to their website the text of
their response to a motion for contempt filed by Vizant in the
Georgia action.  This text included an assertion that Bizzarro
was "in gross violation of his duties as a CEO" and was
"stealing from his employees, stealing from his clients,
stealing from his alliance partners, misrepresenting himself to
the investors of Vizant Technologies, and committing a fraud on
the Georgia court system."

In addition to their company-issued computers and
other electronic devices, defendants retained in electronic form
certain files which belonged to Vizant.  As noted above,
defendants reprinted on their website a statement indicating
that they had the capability to attach "10 cost reduction
reports" to an email and to forward "TONS AND TONS of
incriminating emails."  In addition, during the April 2015
preliminary injunction hearing, Whitchurch admitted that a
number of cost reduction reports resided in defendants' email
accounts as attachments to previously-sent messages.  Whitchurch
conceded that by accessing her Gmail account she could call up

those messages and the attached PDF scans of cost reduction reports.

In connection with this litigation, counsel for Vizant retained a forensic information technology firm, IT Acceleration, to analyze the laptop computers returned to Vizant by Whitchurch and Davis following the termination of their employment.  David Yarnall ("Yarnall"), IT Accelleration's President and Director of Forensic Computing, prepared a forensic report concerning the company's review of the computers and of electronic storage devices returned by defendants to Vizant.  He subsequently testified at the April 2015 preliminary injunction hearing about the contents of his report.[8]

It was Yarnall's updisputed testimony that after Whitchurch's termination a person using her company-issued laptop computer accessed certain files housed on that device after Whitchurch was terminated by Vizant.  Yarnall also determined that on December 9, 2013 a USB storage device was inserted into the computer and files belonging to Vizant were

---

8. Defendants have objected on several occasions to plaintiffs' reliance on Yarnall's report and to his testimony, but they point to no materials in the record that would contradict his testimony.  Here, we rely only on his testimony, and not on the report itself.  We have previously denied defendants' requests to strike Yarnall's testimony and report.

Defendants have also raised general questions about the chain of custody of their company-issued computers and electronic storage devices.  Again, they have presented no evidence that this equipment was tampered with.

transferred onto that device.  Although defendants returned a
USB storage device to Vizant on January 22, 2014, Yarnall found
that this was not the same device that had been inserted into
Whitchurch's laptop on December 9, 2013.  This led Yarnall to
conclude that there is a USB storage device that was inserted
into Whitchurch's company-issued laptop after her termination
and that has not been surrendered to Vizant.  Yarnall was also
able to determine that files belonging to Vizant had been opened
on Whitchurch's company-issued laptop after the date of her
termination.

        In examining the USB storage device that was returned
to Vizant on January 22, 2014, Yarnall also observed that no
record existed of that device ever having been inserted into the
corporate laptops of Whitchurch or Davis.  However, the device
contained information belonging to Vizant which was copied onto
it after December 9, 2013.  This led Yarnall to conclude "within
a reasonable degree of scientific certainty" that "there is at
least one other computer that has copied data to that . . . USB
stick [received by Vizant] that we were not provided for
examination."[9]

---

9.  Yarnall conceded on cross-examination that the dates
corresponding to the use of the devices were based upon the
computer's clock.  By manually changing the date on the
computer, Yarnall stated, a user could change the apparent date
of file removal.  There is no evidence, however, that the dates
were manipulated.

Clients and prospective clients of Vizant have discovered defendants' website and have raised concerns about the allegations contained therein.  For example, Vizant was engaged in marketing negotiations with Amtrak when Amtrak became aware of defendants website.  Bizzarro, who was involved in the negotiations, was compelled to expend time discussing the website with Amtrak's representatives and assuaging their concerns.  Ultimately, Vizant did enter into a contract with Amtrak but only after lowering its compensation rate.  Bizzarro testified that the treasurer of "one of [Vizant's] large clients" had contacted him after finding out about the website.  According to Bizzarro, "we explained it and we got over it, but it came up."  Bizzarro added that "I don't know how many deals we've lost because they've seen the [website].  If you search Vizant, it comes up.  Clearly it comes up, because our name is on" the website.  In addition, Bizzarro testified that the existence of defendants' website gave rise to concerns when Vizant attempted to refinance with a new bank and during recent attempts by Vizant's leadership to explore the possibility of selling the business.  Bizzarro concluded that the website "has intruded in every aspect of our business."

In addition, at least one potential investor, West Capital Management, became aware of defendants' website and thereafter declined to do business with Vizant.  A

-30-

representative of West Capital Management sent an email to

Wiggers in which he stated that he was

> not able to recommend you working with our
> firm given the information that is published
> about you and the work you are associated
> with. . . . We reviewed the website
> [www.nocapitalsolutions.com] and the
> accusations in the site.  Even though you
> and I spoke about the site, I am not able to
> recommend using your services to clients or
> to my partners unless the accusations in the
> site are resolved.

The website's existence has also had an adverse effect

on Vizant's relationships with its employees and board members.

Bizzarro testified that "[w]e have had to do a lot of damage

repair in our sales team the year [Whitchurch] was gone" and

that the actions of defendants have "absolutely impacted my

relationship with our board."  Sharp, who was part of the sales

team supervised by Whitchurch and now serves as Vizant's

National Director of Business Development, testified that she

thinks defendants' website has had an impact on the morale of

Vizant's employees because of the risk that the company will

lose sales opportunities due to defendants' claims.  According

to Sharp, "even if they don't say it directly to you [that the

lost opportunity is due to the website], that's a loss of sale,

that's money right out of their pocket. . . . So I think the

morale is down because of that."

Defendants also created an email address which was apparently designed to look as if it belonged to Jonathan Kalman ("Kalman"), who was at the time a member of Vizant's Board. Defendants used this email address to send emails reiterating their claims about the purported malfeasance of Vizant and its leadership.  Kalman subsequently resigned from the Board.

Defendants have produced no evidence of a Ponzi scheme, fraud, perjury, or "cheating" on the part of plaintiffs which defendants have claimed on their website.

III.

We first discuss whether Vizant is entitled to summary judgment on its breach-of-contract claim.  Each defendant, as an employee of Vizant, entered into a multi-faceted employment agreement with the company.  The terms of those agreements are detailed in the preceding section.  As noted above, the parties agreed to the application of Delaware law.

In order to succeed on a breach of contract claim under Delaware law, a plaintiff "must prove: '1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff.'"  In re G-I Holdings, Inc., 755 F.3d 195, 202 (3d Cir. 2014) (quoting H-M Wexford LLC v. Encorp, Inc., 832 A.2d 129, 140 (Del. Ch. 2003)).  Defendants do not dispute that their employment agreements with Vizant give rise to contractual obligations.  See id.

-32-

The record[10] reveals undisputed material facts establishing defendants' breach of their obligations under the employment agreements.  See id.  First, Whitchurch has acknowledged that she retained access to a number of cost reduction reports for an extended period of time after her termination.  Indeed, at the preliminary injunction hearing which took place nearly a year and a half after she was fired, Whitchurch conceded that cost reduction reports remained accessible to her as attachments saved in her email account.  By retaining these cost reduction reports, Whitchurch breached the provision of her employment agreement requiring her to "deliver to the Company" and "not keep in . . . her possession . . . the originals or copies, whether hard copies or electronic copies, of any and all Confidential Information" following her separation from the company.

Similarly, the uncontradicted testimony of Yarnall makes clear that files belonging to Vizant were transferred from

---

10.  In support of their contention that they are entitled to partial summary judgment, plaintiffs cite the findings of fact and conclusions of law reached by the court in its memorandum accompanying the April 29, 2015 preliminary injunction.  Such findings are not properly considered on a motion for summary judgment to the extent that those findings were based on disputed evidence or if subsequent discovery resulted in facts that could be said to call those findings into question.  See Doebler's Pa. Hybrids, Inc., 442 F.3d at 820.  We base our conclusions here on the record before us, and not on the findings and conclusions we reached in April 2015 insofar as those findings were based on disputed evidence.

defendants' company-issued laptop computers and retained elsewhere after they were fired by Vizant.  The names of the transferred files confirm that at least some of them contained cost reduction reports and other confidential information. Again, by retaining these files, defendants breached their contractual obligations.

Whitchurch and Davis subsequently reprinted on their website the claim that they had attached cost reduction reports to an email.  Thus, they communicated that they still had access to those reports.  Reprinting this statement on the website had no purpose related to their duties as employees of Vizant.  This act therefore violated section 1.2 of the employment agreements, which proscribed the defendants "use" of "Confidential Information for any purpose other than in discharging [their] duties as . . . employee[s] for the exclusive benefit of the Company."

Defendants urge that the record contains no evidence that Davis played a role in the retention or use of cost reduction reports following her termination.  It is true that the email that was purportedly accompanied by 10 cost reduction reports was sent by Whitchurch and not Davis.  However, that email was subsequently reprinted on the website, which Davis and Whitchurch jointly controlled.  Davis, like Whitchurch, breached

her contract with Vizant through her role in publishing statements about the cost reduction reports on the website.[11]

Defendants insist that they are not in breach of their contractual obligations because any information retained by them did not constitute "confidential information" within the meaning of the employment agreement. We disagree. The employment agreement defined "confidential information" to include "proprietary or confidential information, technical data, trade secrets or know-how of the Company . . . including but not limited to" financial information, "marketing information and strategy," information about customers and prospective customers, information about Vizant's suppliers and sources, and "the Company's manner of operation, strategies and plans," as well as "other proprietary and commercial information." There is no dispute that the cost reduction reports consist of financial data about clients and potential clients and the details of Vizant's strategies for cutting a particular client's costs. This material falls squarely within the scope of the employment agreement's definition of "confidential information."

In addition to retaining and using confidential information, defendants also breached sections 2.1.1.1, 2.1.1.2, and 2.1.1.3 of their employment agreements. Section 2.1,

_____

11. We reiterate that Davis, in an email, also claimed to have "TONS AND TONS of incriminating emails" that she could use to "write a novel."

entitled "Covenant Not to Compete,"  prohibited defendants for
two years following their separation from the company from
encouraging any Vizant employee "to terminate his or her
employment with the Company," from "in any way interfer[ing]
with the Company's relationship with its employees," from
"[e]ncourag[ing] or induc[ing] any customers or suppliers of the
Company to terminate business activities with the Company," and
from "engag[ing] in any diversion of good-will regarding the
business as conducted by the Company."  As noted above, the
actions of defendants have significantly damaged morale among
Vizant's employees, specifically its sales employees.
Similarly, defendants' actions engendered doubts among Vizant's
clients and potential clients about the stability of the company
and whether it had the ability to keep clients' data secure.
Further, defendants "engage[d] in a[] diversion of good-will"
regarding Vizant by damaging its relationships with its
employees, with its clients and potential clients, and with its
Board and investors.[12]

In order to prevail on its breach-of-contract claim,
Vizant must demonstrate that it suffered damage as a result of

---

12.  Defendants urge that they did not breach their employment
agreements by voicing their concerns about Vizant's financial
management to its Board of Directors because they did so for
Vizant's ultimate benefit.  Whitchurch adds that when she
emailed Vizant's officers and board members, she was "acting
with good faith."  Vizant does not argue that it is entitled to
summary judgment based on these communications.

defendants' breach of their contractual obligations.  See id.
Vizant points to its lost business, to the fact that it has been
forced to reduce its rates in order to secure the business of
potential clients concerned about defendants' allegations, to
the damaged morale among its sales representatives, and to the
time and effort expended by Bizzarro and other management
personnel in reassuring investors and board members about the
state of the company.  Defendants, meanwhile, urge that Vizant
has not pointed to facts indicative of a "resulting damage."
According to defendants, they – and not Vizant – are entitled to
summary judgment on the breach-of-contract claim.

        The record reveals undisputed evidence that Vizant
suffered "resulting damages" in the form of harm to employee
morale, harm to the relationship between the company and its
leadership and investors, time and energy expended in reassuring
parties who were concerned about the company, and damage to
certain business relationships.  Uncontroverted testimony in the
record makes clear that Vizant's relationship with Amtrak, a
current client, was harmed when Amtrak representatives became
aware of the website.[13]  Vizant was forced to spend time
reassuring Amtrak and chose to lower its compensation rate in an

---

13.  We have previously rejected defendants' arguments that the
evidence offered by plaintiffs concerning Vizant's relationship
with Amtrak should not be considered here.  See, e.g., Order
dated Aug. 31, 2015 (Doc. # 156); Order dated Aug. 19, 2015
(Doc. # 145); Order dated Aug. 19, 2015 (Doc. # 144).

effort to secure a contract with the company.  Vizant has also lost at least one potential investor, West Capital Management, because of the website and has encountered hurdles in its attempts to refinance and to sell the business.  The actions of defendants have also adversely affected Vizant's relationships with its employees and board members.

However, there is a genuine dispute as to whether Vizant suffered any "resulting damage" to its relationship with one of its prospective clients, Tacoma Screw Products.  Vizant has pointed to the testimony of one of its sales representatives that the company's relationship with Tacoma Screw Products was damaged after representatives of the company became aware of the website.  In response, defendants have submitted the declaration of John Wolfe, the Executive Advisor of Tacoma Screw Products, who has declared that the company declined to enter into a service agreement with Vizant after considering "the scope of Vizant's service offerings, the terms of the professional agreement, and the Company's . . . need for such services" as well as "our own internal operations."  Thus, a dispute of fact exists as to the reasons the relationship was discontinued.  We will deny Vizant's motion for summary judgment on its breach-of-contract claim only insofar as that claim is premised on purported harm to Vizant's business relationship with Tacoma Screw Products.

-38-

Defendants have also moved for summary judgment in their favor on Vizant's breach-of-contract claim.  They argue that there is no evidence in the record of Davis' involvement in any breach of contract or any resulting damages, that Whitchurch did not breach her contract because her actions were "authorized by the plain meaning of the contract," and that Vizant has not pointed to adequate evidence of resulting damage.  As discussed above, these arguments lack merit, with the exception of their argument that they did not breach their contracts by communicating their concerns to Vizant's Board.  As to the latter, Vizant does not argue to the contrary.  We therefore conclude that defendants are not entitled to summary judgment in their favor on Vizant's claim for breach of contract, except insofar as that claim is based on defendants' conduct in sending emails to Vizant's officers and board members about their suspicions of malfeasance and fiscal mismanagement.

In sum, we will grant Vizant's motion for summary judgment on its breach-of-contract claim except insofar as that claim is premised on damage to Vizant's relationship with Tacoma Screw Products and on defendants' conduct in contacting Vizant's Board regarding their concerns about financial mismanagement within the company.  We will deny defendants' motion for summary judgment on Vizant's breach-of-contract claim except to the extent that defendants seek summary judgment on Vizant's claims

that they breached their contracts by communicating their
concerns to Vizant's leadership.

IV.

We next address Vizant's claim for misappropriation of
trade secrets.  Vizant has pleaded this claim under Delaware
law, pursuant to the terms of the employment agreements, which
state:  "This agreement shall be governed and construed in
accordance with the internal laws of the State of Delaware
without regard to its choice or conflicts of law provisions."
Broadly-phrased provisions like the one contained in the
employment agreements are deemed to encompass "all tort claims
that may arise from the [a]greement."  Sullivan v. Sovereign
Bancorp., Inc., 33 F. App'x 640, 642 (3d Cir. 2002).  We have
previously applied Delaware law to Vizant's misappropriation of
trade secrets claim.  See Memorandum dated April 29, 2015 (Doc.
# 59).  We do so again here.

In order to prevail on a misappropriation of trade
secrets claim under the DUTSA, a plaintiff must establish the
following elements:

> The acquisition of a trade secret of another
> by a person who knows or has reason to know
> that the trade secret was acquired by
> improper means, or alternatively, the
> disclosure or use of a trade secret of
> another without express or implied consent
> by a person who either: (1) acquired the
> secret by improper means; (2) knew or had
> reason to know that their knowledge of the

-40-

> trade secret was (A) derived by another who
> acquired it by improper means, (B) acquired
> under circumstances giving rise to a duty to
> maintain its secrecy or limit its use, or
> (C) acquired by accident or mistake.

Mattern & Assocs., L.L.C. v. Seidel, 678 F. Supp. 2d 256, 269

(D. Del. 2010) (internal citations omitted).  "Trade secret," in

turn, is defined by the DUTSA as:

> information, including a formula, pattern,
> compilation, program, device, method,
> technique or process, that:
>
> a.  Derives independent economic value,
> actual or potential from not being generally
> known to, and not being readily
> ascertainable by proper means by, other
> persons who can obtain economic value from
> its disclosure or use; and
>
> b.  Is the subject of efforts that are
> reasonable under the circumstances to
> maintain its secrecy.

6 Del. Code Ann. § 2001(4); see also Mattern & Assocs., L.L.C.,

678 F. Supp. 2d at 269.

The content of Vizant's cost reduction reports amounts

to a "trade secret" within the meaning of the DUTSA.  The

reports contain "information, including a "method, technique or

process."  See 6 Del. Code Ann. § 2001(4).  Further, said

information "[d]erives independent economic value" from the fact

that it is not readily ascertainable.  See id.  Finally, Vizant

undertakes efforts to maintain this information as secret.  See

id.  Under the circumstances, these efforts – such as the use of

employment agreements governing the use and distribution of the information, the implementation of precautions for the sharing of client data, and the reliance on network security measures – are reasonable.  See id.  In sum, the content of Vizant's cost reduction reports is a "trade secret" pursuant to Delaware law.[14]

Defendants' conduct with respect to this material amounted to a misappropriation of trade secrets as defined by the DUTSA.  Both defendants "use[d]" the trade secrets "without express or implied content" when they stated on their website that they had retained cost reduction reports in order to threaten Vizant and to deter third parties from doing business with the company.  See Mattern & Assoc., L.L.C., 678 F. Supp. 2d at 269.  The trade secrets "use[d]" in this manner were "acquired . . . by improper means" in that defendants retained them in violation of their employment agreements following their termination.  See id.  The conduct of defendants also satisfied an alternative element of the DUTSA in that both Whitchurch and Davis "knew or had reason to know that their knowledge of" the trade secrets was "[a]cquired under circumstances given rise to a duty to maintain [the secrets'] secrecy or limit [their] use,"

---

14.  Defendants have insisted throughout this litigation that Vizant has not properly identified the "trade secret" giving rise to its DUTSA claim.  However, Vizant has presented evidence that the information at issue falls within the relevant definition of "trade secrets," and defendants have pointed to no record evidence to the contrary.

those circumstances being the employment agreements.  See id.
Defendants point to no record evidence to the contrary.
Further, we note that a defendant need not disclose a trade
secret in order to be liable under the DUTSA.  See Mattern &
Assocs., L.L.C., 628 F. Supp. 2d at 269.  In sum, the evidence
establishes without dispute the liability of defendants to
Vizant for misappropriation of trade secrets under Delaware law.

       According to defendants, Vizant's claim for
misappropriation of trade secrets is barred by Pennsylvania's
"gist of the action" doctrine or by the related doctrine of
economic loss.[15]  The "gist of the action" doctrine is "designed
to maintain the conceptual distinction between breach of
contract claims and tort claims."  Frank C. Pollara Grp., LLC v.
Ocean View Inv. Holding, LLC, 784 F.3d 177, 186 (3d Cir. 2015)
(quoting eToll, Inc. v. Elias/Savion Advert., Inc., 811 A.2d 10,
14 (Pa. Super. Ct. 2002)).  It arises from the notion that "tort
recovery should not be permitted for breaches of contract."  Id.
(internal citations omitted).  There appears to be no equivalent
under Delaware law.  Defendants cite only Pennsylvania law,
notwithstanding that we are required by the terms of the
employment agreements to analyze the misappropriation of trade

---

15.  Defendants treat these two doctrines as though they are
virtually interchangeable, which they are not.  See, e.g.,
Kimberton Healthcare Consulting, Inc. v. Primary PhysicianCare,
Inc., No. 11-4568, 2011 WL 6046923, at *7 (E.D. Pa. Dec. 6,
2011).

secrets claim under Delaware law.  The Pennsylvania authority cited by defendants is inapposite.

Even if we were to apply Pennsylvania law, the DUTSA claim would not be foreclosed by Pennsylvania's "gist of the action" doctrine.  Our Court of Appeals has reasoned that claims for misappropriation of trade secrets like the one now before us "sound[] primarily in tort" and are not covered by that legal framework.  Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc., 530 F.3d 204, 229 (3d Cir. 2008).

Meanwhile, the economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract."  Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir. 1995).  It bars claims arising from "negligence that results solely in economic damages unaccompanied by physical or property damage."  Sovereign Bank v. BJ's Wholesale Club, Inc., 533 F.3d 162, 175 (3d Cir. 2008).  The theory underlying the economic loss doctrine is that enabling a plaintiff to recover for a such "purely economic" loss would "open the door to every person in the economic chain of the negligent person or business to bring a cause of action."  Adams v. Copper Beach Townhome Communities, L.P., 816 A.2d 301, 307 (Pa. Super. Ct. 2003) (citations omitted).

We remind defendants that we are applying Delaware
law, not Pennsylvania law.  Courts in Delaware have declined to
apply the economic loss doctrine to most intentional torts,
including misappropriation of trade secrets.  See, e.g.,
Commonwealth Constr. Co. v. Endecon, Inc., No. 08C-01-266, 2009
WL 609426, at *5 (Del. Super. Ct. Mar. 9, 2009); cf. Getty
Refining & Mktg. Co. v. MT FADI B, 766 F.2d 829, 830 (3d Cir.
1985).

We note that defendants also seek summary judgment on
the misappropriation of trade secrets claim.  However, their
argument consists simply of their reliance on Pennsylvania's
"gist of the action" doctrine.  Insofar as defendants seek
summary judgment on Vizant's misappropriation of trade secrets
claim, their motion will be denied.

V.

We turn next to the claim of both plaintiffs for
defamation.

Pennsylvania law[16] recognizes a claim for defamation
where a plaintiff establishes:

> 1) the defamatory character of the
> communication; 2) its publication by the
> defendant; 3) its application to the

---

16.  Unlike the preceding claims, plaintiffs' defamation claim
does not "arise from the" employment agreements.  See Sullivan,
33 F. App'x at 642.  As a result, the choice-of-law provision
contained in those agreements does not extend to the defamation
claim, which we will analyze under Pennsylvania law.

plaintiff; 4) an understanding by the reader
or listener of its defamatory meaning; 5) an
understanding by the reader or listener of
an intent by the defendant that the
statement refer to the plaintiff; 6) special
harm resulting to the plaintiff from its
publication; [and] 7) abuse of a
conditionally privileged occasion.

E.g., Mzamane v. Winfrey, 693 F. Supp. 2d 442, 476

(E.D. Pa. 2010) (citing 42 Pa. Cons. Stat. Ann § 8343(a)).  A

statement is defamatory if it "tends so to harm the reputation

of another as to lower him in the estimation of the community or

to deter third persons from associating or dealing with him."

U.S. Healthcare, Inc. v. Blue Cross of Greater Phila., 898 F.2d

914, 923 (3d Cir. 1990).  A corporation can be defamed by

allegations against its "officers, agents or stockholders

[which] also reflect discredit upon the method by which the

corporation conducts its business."  Restatement (Second) of

Torts § 561 cmt. b.; see also Gordon v. CBS Broad., Inc.,

No. 3132 EDA 2013, 2014 WL 7920780, at *8 (Pa. Super. Ct. Dec.

8, 2014).

It is for the court to decide whether a statement is

defamatory.  U.S. Healthcare, Inc., 898 F.2d at 923.  In doing

so, the court "must view the statements in context and determine

whether the communication seems 'to blacken a person's

reputation or expose him to public hatred, contempt, or

ridicule, or to injure him in his business or profession.'"

Emekekwue v. Offor, 26 F. Supp. 2d 348, 359 (M.D. Pa. 2014)

(quoting Baker v. Lafayette Coll., 532 A.2d 399, 402 (Pa.

1987)).  "[M]ere insult[s]," such as "expressions of opinion,

without more," and those that are "no more than rhetorical

hyperbole or a vigorous epithet" are not defamatory.  Id.

(internal citations omitted).

As noted above, a plaintiff must generally show

"special harm" in order to make out a prima facie defamation

claim.  See, e.g., Mzamane, 693 F. Supp. 2d at 476.  "Special

harm" is "harm of a material and generally of a pecuniary

nature" and "result[s] from conduct of a person other than the

defamer or the one defamed which conduct is itself the result of

the publication or repetition of the slander."  Restatement

(First) of Torts § 575 cmt. b; U.S. Healthcare, Inc., 898 F.2d

at 923.  Damage such as "loss of reputation" and "lowered social

standing and its purely social consequences," without

accompanying "material" harm, is not "special harm."

Restatement (First) of Torts § 575 cmt. b.

A plaintiff need not establish special harm, however,

if the communications at issue are defamatory per se.  NTP

Marble, Inc. v. AAA Hellenic Marble, Inc., 799 F. Supp. 2d 446,

452 (E.D. Pa. 2011).  The defamation per se doctrine originated

"to provide a remedy for a person whose reputation was damaged

by the very utterance of . . . defamatory words, even though the

person could not point to a specific pecuniary loss." Synygy, Inc. v. Scott-Levin, Inc., 51 F. Supp. 2d 570, 581 n.9 (E.D. Pa. 1999). Words imputing a criminal offense fall into this category, as do those imputing "business misconduct." Id. at 580.[17] If a plaintiff is the target of per se defamation, he or she is merely required to "make a showing of general damage, i.e., proof of reputational harm" or of "personal humiliation." Id. at 581.

The truth of the purportedly defamatory communications is an affirmative defense to a charge of defamation. See 42 Pa. Cons. Stat. Ann. § 8343(b)(1). The same is true of conditional privilege, which relieves a defendant of liability upon a showing that "circumstances are such as to lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exist which another sharing such common interests is entitled to know." Emekekwue, 26 F. Supp. 2d at 364.[18]

---

17. The other categories of statements that constitute defamation per se are imputations of "loathsome disease" and "serious sexual misconduct." Synygy, Inc., 51 F. Supp. 2d at 580.

18. Although "abuse of a conditionally privileged occasion" is technically part of a plaintiff's prima facie defamation case, a defendant bears the burden "to first establish the existence of a privileged occasion." Wilson v. Slatalla, 970 F. Supp. 405, 418 (E.D. Pa. 1997); see also Pa. Cons. Stat. Ann. §§ 8343(a)(7), (b)(2).

Plaintiffs have identified a number of statements that they characterize as defamatory.  It is undisputed that all of those statements were made by defendants.  Of the statements identified by plaintiffs, the record reveals no dispute that <u>at least</u> the following are defamatory statements:

> 1.   "I'm calling you out.  You're a . . . cheat Joe Bizzarro"

> 2.   "You have no intention of paying the full commissions, never have."

> 3.   Bizzarro "has 'enhanced' his reporting to the board so the true financial state of the company is far more positive than the reality."

> 4.   Bizzarro is "a cheat."

> 5.   Bizzarro is "a fraud [and] his resume and credentials are fabricated."

> 6.   Bizzarro "is stealing from his employees, stealing from his clients, stealing from his alliance partners . . . and committing a fraud on the Georgia court system."

> 7.   Vizant, Seidman, Wiggers, Bizzarro, other Vizant employees, and Vizant's counsel "have engaged in a vicious, calculated, and illegal conspiracy to accuse, frame, and victimize the defendants. They have manufactured evidence, extorted the Defendants, committed perjury and subornation of perjury, threatened a witness, and sought the illegal incarceration of the Defendants."[19]

---

19.  Perjury is "[t]he act or an instance of a person's deliberately making material false or misleading statements while under oath; esp[ecially], the willful utterance of untruthful testimony under oath or affirmation, before a

8.   References contained in the
YouTube videos created by defendants and on
the website to the existence of a Ponzi
scheme at Vizant.

Further, there is no dispute in the record that each of these

statements was published by defendants,[20] each applied to

plaintiffs, and the reader of each statement would understand it

to be defamatory and to be made in reference to plaintiffs.

See, e.g., Mzamane, 693 F. Supp. 2d at 476.   Further, to the

extent that the statements impute criminal offenses and business

misconduct to plaintiffs, there is undisputed evidence in the

record that plaintiffs experienced general harm.   See Synygy,

Inc., 51 F. Supp. 2d at 581.   Meanwhile, the evidence is

undisputed that those statements that do not amount to

defamation per se have resulted in special harm.   See, e.g.,

Mzamane, 693 F. Supp. 2d at 476.   Defendants have pointed to no

evidence that the statements above are true, nor have they

identified a dispute of material fact as to the possibility that

the a conditional privilege applies.   See 42 Pa. Cons. Stat.

Ann. § 8343(b)(1); Emekekwue, 26 F. Supp. 2d at 364.   In sum,

_____

competent tribunal, on a point material to the adjudication."
Perjury, Black's Law Dictionary (10th ed. 2014).   It is a crime
under both federal and Pennsylvania law.   See 18 U.S.C. § 1621;
18 Pa. Cons. Stat. Ann. § 4902.

20.  As noted above, all of these statements were published on
the website www.nocapitalsolutions.com, over which defendants
shared control.

plaintiffs are entitled to summary judgment on their defamation claim insofar as that claim is based on the statements listed above.

Plaintiffs have identified several additional statements which, according to them, support their claim for defamation.  There remain genuine disputes of material fact as to whether plaintiffs have made out a defamation claim based on these remaining statements.  To the extent that plaintiffs seek summary judgment on their defamation claim based on statements other than those listed above, their motion will be denied.

Defendants urge that plaintiffs' defamation claim is barred by the "gist of the action" doctrine or by the doctrine of economic loss.  We conclude that neither doctrine precludes plaintiffs' defamation claim, which is unrelated to the employment agreements.

Defendants also seek summary judgment in their favor on the defamation claim.  They urge that there is no evidence in the record to support this allegation against them.  To the extent we have not granted summary judgment in favor of plaintiffs, there are genuine disputes of material fact.  Defendants' motion for summary judgment on Count V will therefore be denied.

VI.

This brings us to the claim of both plaintiffs for tortious interference with existing and prospective business relationships.  It is plaintiffs' contention that defendants improperly interfered with:  Vizant's existing relationships with its employees; the relationship between Vizant and Bizzarro, its CEO; the relationships between Vizant and its existing clients; the relationship between Vizant and its bank; and prospective relationships between Vizant and potential clients and investors.

In order to prevail on a claim for tortious interference with a contractual relationship under Delaware law,[21] a plaintiff must satisfy the terms of § 766 of the Restatement (Second) of Torts.  ASDI, Inc. v. Beard Research, Inc., 11 A.3d 749, 751 & n.3 (Del. 2010).  That section requires a plaintiff to show the existence of "(1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury."  Anderson v. Wachovia Mortg. Corp., 497 F. Supp. 2d 572, 583 (D. Del. 2007).

---

21.  We have previously applied Delaware law to plaintiffs' tortious interference claim, and we do so again here.  See Memorandum dated April 29, 2015 (Doc. # 59); Sullivan, 33 F. App'x at 642.

A related section of the Restatement (Second) of
Torts, § 766A, applies to situations in which a defendant
renders a plaintiff's performance of his own contract "more
expensive or burdensome."  While the Delaware Supreme Court has
not had occasion to pass upon § 766A, a Delaware Superior Court,
in a well-reasoned opinion, has recently endorsed it.  Allen
Family Foods, Inc. v. Capital Carbonic Corp., 2011 WL 1295138,
at *5 (Del. Super. Ct. Mar. 31, 2011); but see Anderson, 497 F.
Supp. 2d at 583.  In our Memorandum dated April 29, 2015, we
predicted that the state's Supreme Court would do the same.  See
Doc. # 59; Nationwide Mut. Ins. Co. v. Buffetta, 230 F.3d 634,
637 (3d Cir. 2000).

Finally, Delaware courts recognize liability for
wrongful interference with *prospective* contractual relations as
set forth in § 766B of the Restatement.  Empire Fin. Servs.,
Inc. v. Bank of N.Y., 900 A.2d 92, 98 (Del. 2006).  Such
liability requires proof of "(a) the reasonable probability of a
business opportunity, (b) the intentional interference by
defendant with that opportunity, (c) proximate causation, and
(d) damages."  Id. at 98 n.19 (quoting DeBonaventura v.
Nationwide Mut. Ins. Co., 428 A.2d 1151, 1153 (Del. 1981)).

Defendants contend that plaintiffs' tortious
interference claim is barred by the "gist of the action"
doctrine.  Again, defendants rely on Pennsylvania law, but we

-53-

have previously made clear that our analysis of the tortious interference claim is governed by Delaware law.  See Memorandum dated April 29, 2015 (Doc. # 59); Sullivan, 33 F. App'x at 642.

The undisputed facts in the record demonstrate defendants' liability for tortious interference with existing and prospective contractual relationships.  There is uncontradicted evidence that opportunities existed for Vizant to do business with certain entities, specifically Amtrak and West Capital Management, and defendants point to nothing to the contrary.  Defendants interfered intentionally with these opportunities when they used their website to urge potential business partners not to develop relationships with Vizant. Indeed, defendants have admitted that it was their goal to deter Vizant's potential clients and investors.  Furthermore, the evidence shows without dispute that defendants' actions proximately caused harm to plaintiffs.  For example, Vizant lost the investment of West Capital Management and lowered its compensation rate for Amtrak.  Again, defendants insist otherwise but have pointed to no record evidence to support their position.[22]

_____

22. However, as noted above, defendants have identified a genuine dispute of material fact as to whether their conduct caused Tacoma Screw Products to decline to do business with Vizant.  We will deny plaintiffs' motion for summary judgment on their tortious interference claim only insofar as that claim is based on the theory that defendants tortuously interfered with

–54–

There is also uncontradicted evidence that the conduct
of defendants made plaintiffs' performance of its contracts
"more oppressive or burdensome" as set forth in § 766A of the
Restatement (Second) of Torts.  For example, the actions of
defendants placed a burden on the contract between Bizzarro and
Vizant by forcing Bizzarro to expend time explaining himself to
the company's Board and working to reestablish its trust in him.
Performance of the contracts between Vizant and its sales
personnel was also rendered more burdensome in that those
salespeople had to expend time reassuring clients who had become
aware of defendants' allegations.  Members of the sales team
have also had to take additional steps to maintain relationships
with existing clients and to build relationships with
prospective clients.  For example, Bizzarro testified that he
and members of the sales team spent time working to convince
Amtrak to enter into a service agreement.  Vizant also lowered
its compensation rate in an effort to secure Amtrak's business.

As noted above, defendants urge that summary judgment
on the tortious interference claim should be entered in their
favor and not in favor of Vizant.  In support of this position
they argue merely that the "gist of the action" doctrine bars

the prospective contractual relationship between Vizant and
Tacoma Screw Products.

Vizant's claim.  We have explained that defendants may not assert the "gist of the action" doctrine here.

In sum, no genuine dispute of material fact exists with respect to plaintiffs' claim for tortious interference with existing and prospective contractual relationships, except insofar as this claim rests on the allegation that defendants' conduct caused Tacoma Screw Products to decline to enter into a service agreement with Vizant.  Accordingly, we will grant summary judgment in favor of plaintiffs on this claim except with respect to Tacoma Screw Products.  We will deny the motion of defendants for summary judgment in their favor on this claim.

VII.

Whitchurch and Davis also seek summary judgment in their favor and against plaintiffs on the first two counts of the complaint.  Count I pleads that defendants violated 18 U.S.C. § 1962(c), a RICO provision which bars any individual "employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce" from conducting or participating "directly or indirectly[] in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  Count II pleads a violation by defendants of 18 U.S.C. § 1962(d), the RICO provision making it "unlawful for any person to conspire to violate" the other provisions of § 1962, including § 1962(c).

Section 1964(c) of RICO, meanwhile, provides in relevant part that a party "injured . . . by reason of a violation of [§] 1962 . . . may sue therefore in any appropriate United States district court."

To succeed on a § 1962(c) claim, a plaintiff must establish:

> (1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated . . . , either directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that he or she participated through a pattern of racketeering activity.

United States v. Irizarry, 341 F.3d 273, 285 (3d Cir. 2003).

An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4); Irizarry, 341 F.3d at 285.  An entity "associated in fact" as set forth in § 1961(4) must in turn have "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle v. United States, 556 U.S. 938, 946 (2009).  Meanwhile, a "pattern of racketeering activity" as set forth in § 1962(c) consists of "at least two acts of racketering activity."

Section 1961(1), in turn, defines "racketeering activity" as "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical." "Racketeering activity" also includes "any act which is indictable under" any one of a long list of provisions of Titles 18, and 29 of the United States Code, as well as certain other indictable offenses.  The predict acts must be related and must "amount to or pose a threat of continued criminal activity." Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1412 (3d Cir. 1991) (quoting H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 239 (1989).

Plaintiffs, in attempting to support their § 1962(c) claim, have failed to point to any evidence in the record that defendants engaged in a "pattern of racketeering activity."  As discussed above, § 1961(1) defines "racketeering activity" to include "an act or threat involving" any one of a list of crimes which includes bribery and extortion, as well as a number of indictable acts.  There is no evidence that the conduct of defendants satisfies these criteria.  Plaintiffs simply assert, without support, that Whitchurch "engaged in wire fraud in furtherance of the Defendants' scheme to defraud and extort money from Vizant," and that certain communications made by defendants following their termination constitute "predicate

acts of mail and/or wire fraud."  Plaintiffs do not explain how this conduct amounted to "extortion" or how it satisfies the elements of 18 U.S.C. §§ 1341 or 1343, the mail and wire fraud provisions mentioned in § 1961(a).  In short, there is no evidence in the record to support plaintiffs' § 1962(c) claim, and defendants are therefore entitled to summary judgment on Count I.

In Count II, plaintiffs allege that the conduct of defendants violated 18 U.S.C. § 1962(d), which makes it a crime "to conspire to violate any of the provisions of subsection (a), (b), or (c) of § 1962.  Plaintiffs have failed to identify any evidence in the record establishing a violation of § 1962 since they have not identified any record evidence of "racketeering activity."  Similarly, plaintiffs have not called our attention to any evidence that defendants conspired to commit a violation of § 1962(c).  As a result, we will grant the motion of defendants for summary judgment on Count II.

VIII.

We turn next to the argument of defendants that they are entitled to summary judgment on Count VII.  That Count specifies that defendants engaged in abuse of process by emailing Bizzarro and other Vizant officers in order to threaten to file a RICO action against Vizant and by continuing to file

motions and briefs, as well as a counterclaim, in the Georgia action after Vizant had filed a notice of voluntary dismissal.

In Pennsylvania,[23] a plaintiff seeking to establish liability for abuse of process must show that the defendant "(1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed[,] and (3) harm has been caused to the plaintiff." Shiner v. Moriarty, 706 A.2d 1228, 1236 (Pa. Super. Ct. 1998) (internal citation omitted); see also Langman v. Keystone Nazareth Bank & Trust Co., 502 F. App'x 220, 224 (3d Cir. 2012).  Abuse of process involves "the perversion of the particular legal process for a purpose of benefit to the defendant, which is not an authorized goal of the procedure." Shiner, 706 A.2d at 1236 (citations omitted).  An abuse-of-process plaintiff "must show some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process." Id.  A defendant who "has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions," is not liable.  Id.

_____

23.  Plaintiffs cite Delaware law in discussing their abuse-of-process claim, apparently in reliance on the choice-of-law provision contained in the employment agreements.  It does not appear that the abuse-of-process claim is a "tort claim[] aris[ing] from the [a]greement." See Sullivan, 33 F. App'x at 642.  The same is true of plaintiffs' claims for fraud (Count IX) and conspiracy (Count X).

Plaintiffs direct our attention to an email sent by Whitchurch in September 2014 to Wiggers, Bizzarro, other Vizant officers, and Vizant's counsel. Whitchurch attached to the email a draft of an "Ammended [sic] Counterclaim Complaint" that she and Davis apparently intended to file in the Georgia action. That draft contained a civil RICO claim against Vizant and certain of its officers, including Bizzarro. Whitchurch wrote that she planned to file the amended pleading within days. She added: "If you are not, and were not a Director, you will need to let me know. I realize the implications of my actions in filing a RICO claim and I have NO interest in naming an uninterested and innocent party." She also declared: "I understand the implications of a claim of this nature far more than the prevailing law. But under no circumstances will I have you continue to disrespect me."

Whitchurch's September 2014 email does not give rise to an abuse-of-process claim. There is no indication that Whitchurch threatened a RICO claim to accomplish a purpose other than that for which the RICO process was designed. See Shiner, 706 A.2d at 1236. Plaintiffs aver that the email acknowledged that defendants "knew it would damage Vizant's reputation even if the suit were without merit," but this mischaracterizes the

email.[24]  Further, plaintiffs point to no evidence that "harm has been caused to" them as a result of the message.  See id.

Plaintiffs also support their abuse-of-process claim by pointing to two filings made by defendants in the Georgia action.  After Vizant had docketed a notice of voluntary dismissal, defendants attempted to file an "amended counterclaim" (although no counterclaim had previously been filed).  Defendants then attempted to appeal the voluntary dismissal of the action.  Again, plaintiffs point to no evidence that these filings were made "primarily to accomplish a purpose for which the process was not designed."  See Shiner, 706 A.2d at 1236.  Although plaintiffs appear to be suggesting that defendants persisted in filing documents in order to extort money from Vizant, they do not direct our attention to anything in the record that would support this theory.

Plaintiffs add that "additional acts also constituting abuse of process have been identified during the course of this case."  They focus on the fact that Whitchurch uploaded those documents to the state court's public docket in response to an order of the Georgia state court directing her to forfeit certain documents belonging to Vizant.  However, Whitchurch

---

24.  Plaintiffs also cite to their complaint.  As noted above, we do not consider the statements made in the complaint to be part of the record.  In any event, those statements merely describe the contents of the email, which is a part of the record.

insists that she did so inadvertently, and plaintiffs point to no evidence that she acted with an ulterior purpose.

Plaintiffs also aver that in the instant matter, defendants "have engaged in continuing abuse of process by repeatedly filing meritless motions, motions for reconsideration, second versions of previously denied motions, and new motions raising the same arguments previously rejected by the Court." This conduct had not occurred at the time the complaint was filed and cannot be used to defeat summary judgment.

In sum, we will grant defendants' motion for summary judgment on Count VII. We need not reach defendants' argument that this claim is barred by the "gist of the action" doctrine.

IX.

In Count VIII, Vizant alleges that defendants engaged in conversion by refusing to return confidential information to Vizant following the termination of their employment. In their brief in opposition to defendants' motion, plaintiffs note, among other things, that Whitchurch has admitted to retaining ten cost reduction reports as attachments in her email account. Because Vizant's conversion claim "arise[s] from" defendants' employment agreements, we analyze it under Delaware law. See Sullivan, 33 F. App'x at 642.

Delaware law defines conversion as an "act of dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent with it." <u>Arnold v. Soc'y for Sav. Bancorp, Inc.</u>, 678 A.2d 533, 536 (Del. 1996) (citation omitted). In order to prevail on a conversion claim, a plaintiff must establish "precisely what property the defendant converted and that his interest in the property was viable at the time of the conversion." <u>E.g.</u>, <u>CIT Comm's Fin. Corp. v. Level 3 Comm's, LLC</u>, No. 06C-01-236, 2008 WL 2586694, at *2 (Del. Super. Ct. June 6, 2008).

In order to raise a conversion claim and a breach of contract claim in the same complaint, a plaintiff "must generally allege that the defendant violated an independent legal duty, apart from the duty imposed by contract." <u>Kyle v. Apollomax, LLC</u>, 987 F. Supp. 2d 519, 525 (D. Del. 2013) (quoting <u>Kuroda v. SPJS Holdings, L.L.C.</u>, 971 A.2d 872, 889 (Del. Ch. 2009). A conversion claim that is "duplicative" of an accompanying breach of contract claim "cannot be sustained." <u>Id.</u> Here, the conversion alleged by Vizant arises exclusively from the duties imposed on defendants by the agreements at the heart of the breach of contract claim. It is therefore

"duplicative" of Vizant's claim for breach of contract.  See id.[25]

Accordingly, we will grant summary judgment in favor of defendants on Vizant's conversion claim.

X.

Count IX of the complaint alleges fraud.  Plaintiffs plead that defendants' fraudulent representations included statements about Vizant's alleged mismanagement of its investors' money and of employee payroll and benefits, as well as averments that the company was not financially sound. Plaintiffs also identify as fraudulent defendants' characterizations of Bizzarro as "immoral" and "dishonest" and their claims that Vizant owed them money.  In addition, plaintiffs claim that defendants fraudulently concealed the fact that these representations "were made solely for the purpose of intimidating and harassing Plaintiffs, family members and friends in order to obtain money to which they were not entitled."

To succeed on a claim for fraud or fraudulent misrepresentation under Pennsylvania law, a plaintiff must establish the existence of:

_____

25.  Defendants argue as much, noting that the "conversion claims are not independent of plaintiff's BREACH OF CONTRACT claim and the defendants' contractual obligations."

> (1) a representation; (2) which is material
> to the transaction at hand; (3) made
> falsely, with knowledge of its falsity or
> recklessness as to whether it is true or
> false; (4) with the intent of misleading
> another into relying on it; (5) justifiable
> reliance on the misrepresentation; and (6)
> the resulting injury was proximately caused
> by the reliance

Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994).  Fraud claims "are

meaningless epithets unless sufficient facts are set forth which

will permit an inference that the claim is not without

foundation or offered simply to harass the opposing party and to

delay the pleader's own obligation."  Presbyterian Med. Ctr. v.

Budd, 832 A.2d 1066, 1072-73 (Pa. Super. Ct. 2003) (quoting Bata

v. Central-Penn Nat'l Bank of Phila, 224 A.2d 174 (Pa. 1967)).

In opposition to defendants' motion for summary

judgment on the fraud claim, plaintiffs simply urge that

"[d]efendants have made numerous exorbitant monetary demands of

Plaintiffs, while they have offered no proof that they are

entitled to any amount of money from Plaintiffs."  To defeat

defendants' summary judgment motion, plaintiffs must point to a

genuine dispute of material fact.  See Fed. R. Civ. P. 56(c)(1).

They have not done so.  They simply insist that defendants'

statements were demonstrably false, without addressing the

additional requirements of a fraud claim:  materiality, knowledge

of or recklessness as to the falsity of the representation, intent,

justifiable reliance, and harm.  See Gibbs, 647 A.2d at 889.

-66-

Plaintiffs also fail to cite any authority in support of their fraud claim.

For the foregoing reasons, we will grant the motion of defendants for summary judgment on Count IX, that is plaintiffs fraud claim.  We need not reach defendants' argument that this claim is barred by the doctrine of economic loss.

XI.

This brings us to Count X, which pleads civil conspiracy.  Plaintiffs allege that defendants conspired to defraud them and to extort money from Vizant through unlawful means, including fraud, conversion, misappropriation of trade secrets, tortious interference, and abuse of process.

A civil conspiracy claim under Pennsylvania law requires a showing that "two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means."  Skipworth by Williams v. Lead Indus. Ass'n, Inc., 690 A.2d 169, 174 (Pa. 1997).  Malice, that is "intent to injure," is "essential in proof of a conspiracy." Id. (citation omitted).

To withstand summary judgment on a civil conspiracy claim, a plaintiff must produce "evidence which would establish that [defendants] acted in concert to commit an unlawful act or do a lawful act by unlawful means, and that they acted with malice."  Id.  Plaintiffs have failed to do so.  Instead, they

merely assert (without citing to the record) that defendants
"combined and agreed with intent to defraud Plaintiffs and
extort money from them to engage in unlawful means, including
fraud, misappropriation of trade secrets, tortious interference
and abuse of process."  They support this claim by citing to the
complaint, which, as discussed above, does not contain facts in
which we may rely in deciding a motion for summary judgment.
What is more, plaintiffs have not identified evidence that
defendants acted with malice.  Though the existence of malice is
fact-specific, the Pennsylvania Supreme Court has upheld the
entry by a trial court of summary judgment on a civil conspiracy
claim on the ground that no malice had been demonstrated in the
record.  See id.

Accordingly, defendants are entitled to summary
judgment on the civil conspiracy claim.

XII.

Plaintiffs ask the court to enter a final monetary
judgment in their favor and against defendants in the amount of
$5,052,352.42.  This sum consists of:  $733,036.42 in legal fees
and costs incurred by Vizant; $4,219,316 in compensatory damages
corresponding to Vizant's alleged lost revenue; and $100,000 in

compensatory and exemplary damages to which plaintiffs claim Bizzarro is entitled.[26]

There remain genuine disputes of material fact as to whether plaintiffs are entitled to the amount of damages set forth in their motion.  For this reason, insofar as the motion of plaintiffs seeks final monetary judgment, it will be denied.

### XIII.

Finally, plaintiffs seek to convert the preliminary injunction of April 29, 2015 into a permanent injunction.  Our Court of Appeals has held that "[t]he standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that [in the preliminary injunction context] the plaintiff must show a likelihood of success on the merits rather than actual success." Ferring Pharms., Inc. v. Watson Pharms., Inc., 765 F.3d 205, 215 n.9 (3d Cir. 2014).  Thus, a plaintiff seeking a permanent injunction has the burden of establishing:  (1) success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that a grant of injunctive relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief.  See id.; Kos Pharms., Inc. v. Andrx Corp., 369

---

26.  In their motion, plaintiffs initially requested an award of $4,992,496.45.  They subsequently revised this number on the grounds that their demand for legal fees had inadvertently been inflated and that they had accidentally neglected to include the $100,000 in exemplary damages in the total.

F.3d 700, 708 (3d Cir. 2004).  Stated differently, the issuance
of a permanent injunction is appropriate where "(1) the
plaintiff successfully proves the merits of the case, (2) no
available remedy at law exists, and (3) the balance of the
equities favors granting such relief." Subacz v. Sellars,
No. 96-6411, 1998 WL 720822, at *2 (E.D. Pa. Sep. 21, 1998).

     The requirements for a permanent injunction are
"generally less stringent" than those for a preliminary
injunction, but they "require certainty on the merits." Brennan
Petroleum Prods. Co., Inc. v. Pasco Petroleum Co., Inc., 373 F.
Supp. 1312, 1316 (D. Ariz. 1974).  Accordingly, a permanent
injunction is normally issued "only after a full trial on the
merits." Chappell & Co. v. Frankel, 367 F.2d 197, 203 (2d Cir.
1966).  However, some decisions in this district "have treated
preliminary injunction hearings as final hearings on the merits
permitting entry of a permanent injunction when additional
proceedings were unnecessary to rule on plaintiff's claims."
United States v. Berks Cty., Pa., 277 F. Supp. 2d 570, 578 (E.D.
Pa. 2003).  Courts adopting this approach must take care to
recast their findings through the lens of the standard
applicable to permanent injunctions. Ciba-Geigy Corp. v. Bolar
Pharm. Co., Inc., 747 F.2d 844, 847 (3d Cir. 1984).

     Here, plaintiffs have satisfied the first element of
the permanent injunction analysis in that they have succeeded on

-70-

the merits.  As discussed above, we have granted partial summary judgment in favor of plaintiffs on the same claims that served as the basis for the preliminary injunction.

In our decision dated April 29, 2015, we found that Vizant had shown that it would "suffer irreparable harm if the injunction is denied," that a grant of injunctive relief would "not result in even greater harm to the nonmoving party," and "that the public interest favors such relief."  See Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004).  Since that time, no new evidence has been presented by any party that would call our findings into question.  Recognizing our obligation to recast our findings in the context of the standard applicable to permanent injunctions, we nonetheless conclude that the requirements for a permanent injunction have been satisfied.  See Ciba-Geigy Corp., 747 F.2d at 847.

Section 2.1 of the employment agreements placed certain restrictions on defendants for two years following their separation from Vizant.  Specifically, during that period defendants were barred from "[e]ncourag[ing[ any employee to terminate his or her employment with" Vizant, "[e]ncourag[ing] or induc[ing] any customers or suppliers" to terminate their relationships with Vizant, and "engag[ing] in any diversion of good-will regarding the business as conducted" by Vizant.  Since we issued the preliminary injunction, the two-year period set

forth in section 2.1 has expired.  As a result, were they to engage in the conduct described in section 2.1, defendants would no longer be in breach of their contracts.  However, such conduct would still amount to tortious interference under Delaware law, as described above.  It is therefore appropriate to convert the preliminary injunction to a permanent injunction, notwithstanding that its basis in Vizant's breach-of-contract action has expired.

Defendants assert, without support, that "the court should first order plaintiff to identify an alleged secret." They appear to refer to Vizant's misappropriation-of-trade-secrets claim and to the assertion that some of the material retained by defendants amounts to confidential information. When we issued the preliminary injunction, we found that the cost reduction reports did contain confidential information and that the information set forth in those reports "clearly constitute[d] 'trade secrets.'"  Defendants have called to our attention nothing in the record to contradict the evidence that supported those findings.  In effect, without any new evidence, defendants are merely asking us to revisit the findings we made at the preliminary injunction stage.[27]  We decline to do so.

---

27.  Indeed, defendants conclude their argument on this point by "request[ing] the Court reconsider the preliminary injunction."

Plaintiffs have shown that a permanent injunction is warranted.  We will convert paragraphs 4, 5, and 7[28] of our preliminary injunction of April 29, 2015 into a permanent injunction.

---

28.  The remaining paragraphs ordered defendants to take certain steps by specific dates (which have since passed) and directed Vizant to give security in accordance with Rule 65(c) of the Federal Rules of Civil Procedure.  These paragraphs are not relevant to the permanent injunctive relief sought by plaintiffs.